[PHILADELPHIA, MAY 1ST, 1841.]

EAGLE and Another *against* WHITE and Others.

| 6wh 505 |
| 36 SC 636 |

IN ERROR.

The defendants, who were common carriers on the rail-road from Philadelphia to Columbia, undertook to carry certain boxes of goods belonging to the plaintiffs from Philadelphia to Columbia. The cars arrived at the latter place about sundown on a Saturday evening, and by direction of the plaintiffs were placed on a sideling. The plaintiffs declined receiving the goods that evening on the ground that it was too late; whereupon the agent of the defendants left the cars on the sideling, taking with him the keys of the padlocks with which the cars were fastened, and promised to return on Monday morning. The cars remained in this situation until Monday morning, when they were opened by the plaintiffs by means of a key which fitted the lock; and on examination it was discovered that one of the boxes had been opened and the contents carried away : *Held*, that the defendants were liable to the plaintiffs for the value of the goods lost. [HUSTON, J., dissenting.]

ERROR to the District Court for the City and County of Philadelphia, to remove the record of an action on the case brought by Stephen F. Eagle and William Hessin, trading under the firm of Eagle & Co., against John White, Jesse White, and George Emerick, trading as J. &. J. White & Co.

The action was against the defendants as common carriers, for not delivering a box of merchandise, valued at $417, which the defendants for a certain freight undertook to carry from the city of Philadelphia to Columbia, in Lancaster county. The defendants were " forwarding merchants," and their business was to forward goods in cars on the Philadelphia and Columbia Rail-Road.

On the trial before PETTIT, (President,) the plaintiffs gave in
VOL. VI.—64

(Eagle *v.* White.)

evidence a receipt, signed by the defendants, for certain boxes of goods marked "Eagle & Co., Columbia." And a bill of lading from J. & J. White & Co., for Eagle & Co., Columbia; 4 boxes marked 357, 150, 448, 445; 5 trunks, 4 barrels, &c.

The plaintiffs then called James Wright, a witness who testified that all the boxes except the one marked 445, were received. The witness proceeded: "The cars containing these goods arrived on Saturday evening; I don't know what time in the evening; we opened the cars on Monday morning; between 8 and 9 o'clock in the morning on Monday after the date of the bill of lading; we did not find the box till we had taken the second dray load out of the car. William Winston was the man who unloaded the cars and took the things out; William Nowland was the drayman. When we took the box out of the car from which the goods were missing, the bottom was knocked out of it. We got the key of the car from Cotterill & Haldeman's hardware store; it was not the key belonging to the car, but we borrowed one that would open it; the reason why we did so was, because Nowland was waiting to unload; he went off once, because he could not unload them; the second time he came back to unload, he was going off, and then we got the key."

Another witness for the plaintiff, named Wm. Vincent, testified, that "the cars arrived on Saturday evening; I was not there at the time they came; I did not see them till Monday morning; I went down early to get the job of unloading them. We waited till between 7 and 8 o'clock in the morning; the agents were not there; we started to shove the cars up; as the doors were on the wrong side, we turned them and brought them down, and then Mr. Wright unloaded one of them. I was the first man that stepped into the car to take out any of the goods, and took out six trunks and some small kegs that made one load, and brought it up, and then came for the second load; there were two large boxes stood front, and between them was the box that was empty. I caught hold of it and was almost thrown out, for I thought it was full; I made a sudden pull at it. It was empty, had nothing in it except a couple of pieces of the lid. It was the top that was taken off, and not the bottom. The next big box that we came to, had a hole cut in it that a man might get his hand in it; the covering around the goods was cut, and it was found, it had nothing but domestic muslin in it. I saw nothing else disturbed about this box; I think the agent did not come till between 10 and 11 o'clock. I do not know his name. Henry Flury did not come till after the cars were wholly unloaded; when he came he said he did not think the cars ought to have been opened before he was there, when he found the goods were lost."

William Nowland testified, "I am not acquainted with the time the cars arrived. I went down early on Monday morning to unload

(Eagle v. White.)

them with my dray and other things. When I came there, there was no agent; then I went to other employ for a while, and was sent for again, and still there was no agent; this was in about an hour after I was first there. Mr. Eagle and his young man detained me, and in about half an hour they opened a car; we went to work to unload, and when we came to take out the second load we found this box broken and the contents of it gone. There was nothing in it except a couple of pieces of board that belonged to the box. I was there when the box was discovered; the cars were standing on Christian Haldeman's sideling, about sixty or seventy yards from Mr. Eagle's store; we observed another one broke, a part of the lid off, and the goods cut; check and muslin."    *    *    *

" Merchants generally own the cars the goods come in; and they will have them when they come, whether the agent is here or not." " The box that was empty was about in the centre of the car; there were some trunks upon the top of it; we took a load of trunks off and other small articles before we discovered the box at all. I did not observe any idle persons about that day; there were some coloured people employed there, and some persons passing by. It was about 10 o'clock that the persons came that I took to be agents from their conduct."

Gerardus A. Haines testified, " About dusk in the evening of Saturday, some person came into the store of Messrs. Eagle & Co., and said they had three cars for us. I asked where they were, and he said on Haldeman's sideling: he asked if he could unload. I said we could not; it was too late; but we would unload on Monday morning as soon as he came; at any time he would call: he said then, he would be there on Monday morning early; with that he went out, and I saw no more of him till Monday morning; when the cars were unloaded, or the best part of them; this was about 10 o'clock; he was the same person who was there on Saturday evening. I am a clerk in the store of the plaintiffs."

On the part of the defendants, the following evidence was given, taken under a commission to Lancaster.

Henry Flury testified as follows :—" I was conductor of the cars belonging to Futhey at the time the goods were supposed to have been stolen; it was on Friday the 11th of March, 1836, that we loaded the goods at Mr. White's warehouse in the city of Philadelphia; the goods were for Eagle in Columbia; there were three cars loaded for Eagle; they were loaded with dry goods and groceries; I was agent on two of them. After they were loaded, and a manifest made out, they were taken to the head of the plane the same evening about sundown, and stood there over night; next morning we got them ready and attached them to the locomotive; it was a little cool in the morning; I had a coat in the cars, in one of them;

(Eagle *v.* White.)

I can't tell which one; I unlocked one, it was not in that one; I looked through it and couldn't see it; then I went and unlocked the other one, and found it there; when I looked in them the things were in them just as they were when we loaded them at the warehouse; I helped to load them at the warehouse; I locked up both the cars after I got my coat out. We started and arrived at the head of the Columbia Inclined Plane the same day before sundown; we went down the plane, put the cars on Haldeman's sideling the same evening between sundown and dusk; we put the cars in the place where Mr. Eagle directed us. There was another agent came up the same day with three cars; one of them was for Mr. Eagle, and two were to go to Borbridge's warehouse. I was with the cars from the time they started from the plane at Philadelphia, until they were put on the sideling, where Mr. Eagle directed. They could not have been opened or any thing taken from them without my knowledge or observation from the time they left the plane at Philadelphia until they arrived on the sideling, as the engine only stopped a few minutes to take in water, during which time I oiled the cars; to my knowledge there was nothing taken out in the intermediate points. Mr. Eagle was not present when the cars arrived; he was up at the store. There was no person present acting for Mr. Eagle when the cars arrived on the sideling; after the cars were put on the sideling, I took off the side chains and put them in a small box on the side of the cars and locked them; I walked around the cars to see if all was right; I found all was right, and locked up tight; I had the keys in my pocket; I then left them, and went up to Borbridge's along with the other agent, and over to Wrightville, that same evening, and did not return to Columbia until Monday morning, between six and seven o'clock. I went to the place I put the cars, and found them there still; Eagle was there, and had two cars unlocked and one unloaded, and the other one about half unloaded. After the cars—the same cars—were unloaded, we took them over the river, loaded them, and brought them back." Cross-examined.—" They were Fusey & Smith's cars. I am in no way responsible for goods lost; we have no contract for the liability of goods lost. I had the manifest in my possession; it's the bill of lading; the bill of lading was given to Mr. Robert W. Smith, when we were going across the bridge on Saturday evening to Wrightville, by me; this was between seven and eight o'clock on Saturday evening the 12th of March, 1836. Mr. Smith staid at Wrightville that night; didn't go back before morning 'that I know of; his family reside there. We generally unloaded at Borbridge's warehouse. I never had any goods for Columbia in my charge before these two cars. The Saturday we arrived at Columbia was a clear starlight evening. The sun was just going down when we put the cars on the sideling; it was a clear evening. It's about twenty or thirty yards from the sideling to Mr. Eagle's store. The goods would have to be hauled

(Eagle *v.* White.)

from there to the store in drays or wagons; they could be wheeled up or carried. The draymen and workmen had not stopped work yet when we placed the cars on the sideling; the sun was about going down; I don't know whether it was the time to quit work or not. I didn't deliver these cars over to the custody of any other person, but put them where I was directed. I didn't put the cars into the custody of Mr. Eagle, or any person for him; there was no person there to receive them. I put them where I was told. When I delivered goods, I generally gave the bill of lading to Robert W. Smith, of all the cars when I arrive at Columbia, or if he ain't there, I give it to him at Wrightville. Mr. Smith delivers the goods, and sees that all is right; the persons to whom the goods are sent, don't get the manifest until the goods are delivered, so much as I know. When I examined the cars at Philadelphia at the head of the plane, I didn't examine every box. I could'nt see every box; the cars were loaded all full, and I couldn't see that any thing had been disturbed from the way they were put in the cars."

Stephen Smith testified as follows :—" I have hauled goods several times for Eagles. I have generally unloaded the goods on the sideling nearly opposite their store for them—what I mean by hauling is by my cars; one or two instances I have unloaded in the main track opposite their door. It is usual for my agent or clerk to receive the manifest from the conductor of the cars. The custom is to let the owners of the merchandise know as soon as the goods are arrived at Columbia." Cross-examined.—" We take good care of the manifest until the goods are delivered and see that all's there; the manifest is used in taking out the merchandise; it's marked as each box is taken out; when I inform the persons for whom the goods are, of their arrival. I don't deliver up the manifest, nor the key of the car. I was never asked for it." " The sideling belongs to Mr. Haldeman. It would take, I think, three hours to unload the goods and haul them to Mr. Eagle's; I think so, with one wagon." " I generally place the cars to the place directed by the owners; if not directed, I place them in my own warehouse."

Robert W. Smith, having been released by the defendants, testified : " I went over the river to the head of the Columbia Plane from Wrightsville on Saturday the 12th of March, 1836, expecting our cars up from Philadelphia. While I was waiting for them the passenger train arrived. Stephen Eagle got out of one of the passenger cars, and told me our cars were loaded for him, and directed me to have them put on Haldeman's sideling, as he had made arrangements with Mr. Haldeman to that effect to have them placed there. When the cars arrived I directed the agents to have them put there according to his directions. I directed our agent, James Moss, to go and inform Mr. Eagle that they were there. When we found

that we couldn't be unloaded that evening, we then left the cars there. I know that Flurey gave me the manifest that evening, and I had it on Monday morning, but where he gave it I don't know. We went over on Monday morning from Wrightsville to Columbia, —we all live in Wrightsville, the agent and myself. When we arrived at the cars we found two of them open; one of them was entirely unloaded, the other about half—some persons busily engaged in taking out the goods. I then went up to the store, and learned at the store that some of the goods had been stolen. Mr. Eagle then told me that the goods had been stolen; that he supposed they were in the upper part of the town at Tow Hill. He advised me to consult with James Collins, who lives a few doors above Mr. Eagle's; I did, and found he had been spoken to before on the same subject. As soon as I found one of the cars had been unloaded and the other part, I went up and handed the manifest to Mr. Eagle. In walking along the street I considered over the matter and thought we had performed our part, and went in and told Mr. Eagle so. This was on my way down from Collins's." Cross-examined.—" When Mr. Eagle directed me to put the cars on Haldeman's sideling, the cars that contained the goods hadn't arrived yet. The cars were put on the sideling between sundown and dark I suppose—when I sent the agent to inform Mr. Eagle that the cars were on the sideling, I didn't send the manifest or keys to be given to Mr. Eagle. It is not customary for us to do' so. As we direct the agent to bring the manifest to us to take a copy of it as also the clearance, we have no particular time that the manifest should be given to the consignee, we' generally give them an account of the goods, in many instances no manifest at all."

" There is a place appropriated for cars when there are no instructions how to dispose of them. We put them on the public state sideling, to be there a certain length of time; that is our usual place when we have no direction. We have a warehouse and depot at Wrightsville, across the river. In case no directions from Mr. Eagle had been received, we should have taken them up to a warehouse at the Basin. They would have been in the custody of the keeper of the warehouse. Our custom was to leave our cars, with goods for Columbia, at the warehouse if not otherwise directed, in the custody of the keeper of the warehouse, for which the keeper of the warehouse usually receives pay from us. It is to the benefit of the merchant that goods do not go to the warehouse."

Thomas Borbridge testified: " In March, 1836, I resided in Columbia; I kept a warehouse. The cars of Fusey & Smith run to me frequently. They run good substantial cars, as good as any on the road. I never examined the fastening to their cars particularly. The time in which one of the cars can be unloaded is from half an hour to an hour into a warehouse; it depends on the help pretty

(Eagle *v.* White.)

much, and on the nature of the load. I do not recollect receiving a load from these cars on the 11th of March, 1836; I received so many, it would be impossible for me to remember." Cross-examined.—" In the spring of 1836, I was in a receiving, forwarding, and commission house in Columbia. I had a warehouse, but not for my cars. The warehouse was for receiving goods. We always took the goods into the warehouse out of the cars and distributed them. We frequently left goods out all night in the cars; never when we had room in the warehouse, and had time to place them there. I have no doubt I received goods by Fusey & Smith's cars in 1836. I cannot say for certain whether I received any during that year from the defendants' cars. It would take three or four or five hours to unload three cars at Haldeman's sideling and carry them to Eagle's warehouse in drays. It would depend altogether on the disposition of those the goods were coming to, whether it would be too late to unload at sunset. In my warehouse the floor was level with the cars, which was not usual. There would be between two and three hours difference in unloading these cars at Haldeman's sideling into Eagle's and from the same number of cars at my warehouse into it. Cars must go into sidelings or warehouses to unload. I think Haldeman's sideling is the nearest to Eagle's." Re-examined. —" I frequently have carried goods for Mr. Eagle, which were consigned to me and unloaded at Haldeman's sideling. Can't recollect whether he ordered it to be done. It was more convenient for him, as there would be a shorter distance to haul them, than from my warehouse. When I had a full load, as a matter of accommodation to Eagle, I unloaded at the sideling. I had the same commission if unloaded at the sideling as if put in my warehouse. It was sometimes a convenience to myself to unload Eagle's goods at Haldeman's sideling, when my warehouse was full."

James Moss testified as follows: " I am about 44 years of age; I have been on Fusey & Smith's line since they began running. To the best of my knowledge on the 11th day of March, 1836, I loaded goods at the defendant's in Broad street, on the same day we arrived at the head of the inclined plane at the Schuylkill. On Saturday the 12th day of the month we arrived at Columbia in the afternoon near the border of sundown. We put the cars on Mr. Haldeman's sideling. I then went up to Mr. Eagle's and told him the number of cars we had for him, three cars, and we wished to have them unloaded that afternoon; he refused to receive them that afternoon. I asked him the reason why; he said it was too late, and he was busy in the store; on Monday morning, said he, we will unload you. I then left the store; I went to Mr. Borbridge and unloaded two cars for him, that belonged to the same train. I took home those two cars to Wrightsville on the other side of the river. I came back on Monday morning with the Mr. Smiths, the

(Eagle v. White.)

owners of the cars from Wrightsville to Columbia; when we arrived Mr. Eagle had two of the said three cars unloaded; one entirely unloaded, and another partly unloaded. Those three cars belonged to John S. Fusey and Robert Smith; neither of those persons are defendants in this case. I went from Philadelphia to Columbia on the occasion mentioned, as running agent for the said John S. Fusey and Robert Smith. I and Henry Flury, the other agent, kept possession of the keys of three cars, from Saturday until Monday. The three cars were substantial, good cars; as good as any on the road. They had doors at the side. They were fastened with locks and keys, with staples and hinges, such as are necessary to fasten doors of the kind. There was an iron bar from one side of each door to the other to fasten the door with. The bars were about half an inch thick and two inches wide. The lock was a common padlock, such as are used in the cars on that road. The three cars were left about forty or fifty yards from Mr. Eagle's store. If goods can be unloaded, it is generally done; if not, it is customary to leave them in the cars all night." Cross-examined.—" We left Philadelphia on the afternoon of Friday, the 11th of March. It was between 1 and 6 o'clock that we left. Got to inclined plane (eastern) not later than sundown. The cars staid there on the state sideling all night, until the next morning. I was at Mr. Hansell's tavern, at the head of the plane, all that night. It may be a hundred yards from the head of the plane to Mr. Hansell's tavern. There was another agent on that trip. His name is Henry Flury; he accompanied me to the inclined plane that night; he had charge of them all that night, but I can't tell whether he was present watching them. I cannot tell the hour when we arrived at Columbia; it was before sundown that we arrived at the head of the Columbia plane; I can't tell how long we were at the head of plane before we descended. To the best of my knowledge, it was about sunset when I arrived at Mr. Eagle's. When they told me they could not unload the cars that evening, I left them and went to Borbridge's. The three cars for Mr. Eagle were left on the sideling. No one was left in charge of them. They were put in no car house that night. Fusey & Smith have no car house in Columbia; they have one in Wrightsville. The other lines have sidelings with covers to them. I have left cars out all night and with goods in them, before that time and since too. There was nothing in this padlock peculiar or different from the ordinary padlock. There are two staples, one on the one door and the other on the other door. There are two doors. The bar is fastened at one end by the padlock. The other end is fixed in a staple fastened in the jamb of the other door. When not locked, the bar is of no use, except to keep the door shut. I think we came to Columbia on Monday, between the hours of 8 and 9, A. M. Mr. Eagle was at the cars at Haldeman's sideling; that was the reason I did not go to him. He met me before I got to the cars. I went to the sideling

(Eagle v. White.)

for the purpose of unloading the cars for Mr. Eagle. I was then, have been ever since, and now am in the employ of Fusey & Smith. Fusey & Smith had three cars at Mr. White's and two at Mr. Hunt's on the morning of the 11th March. We took the three cars from Mr. Hunt's to Mr. White's that morning. I don't recollect whether any of Mr. White's cars went over the road that day. It is about thirty yards from the engine house, on the head of the eastern plane to the state sideling. The state employs a watchman at the Schuylkill River Inclined Plane, to watch the property of the state and every thing else that is there. His employment is to watch at night. Fusey & Smith live in Wrightsville, and have their establishment there. Wrightsville is on the west, and Columbia the east side of the river. I had not the time with me. On Monday morning, as near as I could come at it, it was between eight and nine, I saw Mr. Eagle."

The plaintiffs' counsel requested the court to charge the jury :—

" 1. That it was the duty of the defendants, as common carriers, to cause the goods to be actually delivered to the plaintiffs.

2. That placing the cars on Haldeman's sideling was no delivery to the plaintiffs.

3. That to constitute a delivery, it is incumbent on the carrier to have the goods carefully separated, and designated for the consignee.

4. That the retention of the keys of the car, and the manifest or bill of lading, by the carrier, is in law conclusive that no *delivery* had been made till Monday.

5. That the inability or refusal of the plaintiffs to receive the goods on Saturday evening, did not justify the carrier in leaving or abandoning them.

6. That the goods were at the risk of the defendants until there had been a delivery in person to the plaintiffs.

7. That to constitute a valid delivery, it ought to be at a seasonable time of the day, with reference to the accustomed hours of business."

The court charged the jury in answer to the first point:

" This is true; but the defence taken here renders it necessary for me to add, that if the usual and proper steps towards the actual delivery were prevented by the interference and conduct of one of the plaintiffs, the rule is not applicable; and the jury will decide the facts. The consignee may take charge of the goods before they have arrived at the ultimate place of delivery, and the carrier's risk will then terminate."

To the second point, the court answered:

" This is true; but if they were so placed by the plaintiffs' direction,

VOL. VI.—65

(Eagle *v.* White.)

and an actual delivery was thereby prevented, such delivery could not be required. The facts are for the jury."

To the third point, the court answered:

"·This is true; but if such separation and designation was prevented by the conduct of the plaintiffs, the rule does not apply. The facts are for the jury."

Upon the fourth point, the court answered:

" Unconnected with any interference of the plaintiffs, this may be conceded; ~but connected with such interference, the circumstances have no conclusive effect, particularly if the actual delivery was rendered impossible by the conduct of the plaintiffs. The facts are for the jury."

Upon the fifth point, the court answered:

" This is also true, if unconnected with the plaintiffs' interference; but whether the conduct of the plaintiffs was such an interference as authorised the defendants to place and leave the goods as they did, is a matter of fact for the jury."

To the sixth point, the court answered:

" This is true, unless a delivery was prevented by the plaintiffs' own conduct; and of this, the jury will judge as matter of fact."

As to the last point, the court answered:

" This is true."

The jury found for the defendants; whereupon, the plaintiffs took this writ of error, and assigned the following errors:

" 1. The answers of the court to the several points propounded by the plaintiffs.

2. That the court erred in leaving to the jury as a matter of fact, to say whether the delivery was prevented by the plaintiffs' conduct.

3. Because, whether the circumstances in this case excused an actual delivery, or amounted to a delivery, was a question of law, which the court ought to have decided, and not left to the jury.

4. That on the facts in evidence, the court should have charged the jury that the plaintiffs were entitled to recover."

The case was argued at December term, 1840, by Mr. *Hazlehurst* and Mr. *M'Call* for the plaintiffs, and Mr. *Meredith* for the defendants.

A re-argument having been ordered, it was again argued at this term by Mr. *Hazlehurst* for the plaintiffs, and Mr. *Meredith* for the defendants.

For the *plaintiffs*.

In *Duff* v. *Budd*, (3 *Brod. & Bing.* 177; 7 *E. C. L. R.* 403,) Bur-ROUGH, J., says, " Carriers are constantly endeavouring to narrow their responsibility and to creep out of their duties; and I am not singular in thinking that their endeavours ought not to be favoured." In *Hart* v. *Allen*, (2 *Watts*, 116,) Chief Justice GIBSON says, " A carrier is an insurer against all losses, without regard to degrees of negligence in the production of them, except such as have been caused by an act of Providence," &c. It is the duty of a carrier to deliver. Here there was no delivery. Some of the witnesses show a mere offer to deliver, and an inability or refusal to receive at the time, and placing them on the sideling at the plaintiffs' request; the carrier keeping the key and custody, and promising to come on the Monday morning following. The defendant's agent did not consider that he had delivered the goods, because he undertook to return for the purpose. This is like the case of *Ostrander* v. *Brown*, (15 *Johns.* 42.) It is said that there was no notice in this case; but *Cope* v. *Cordova*, (1 *Rawle*, 203,) holds that notice need not be given. The effect of the direction was not to absolve the carrier, but merely to substitute a different place to remain at: the delivery was yet to be made, and the goods remained at the risk of the carrier. It has never been held that a notice of arrival is equivalent to a delivery. 1 *McClelland & Younge*, 129. A direction to deliver at the sideling, did not mean that they were to be there abandoned. *Gatliffe* v. *Burne*, (4 *Bing. N. C.* 314; 33 *E. C. L. R.* 364.) If after being on the side-ling, the defendant ceased to be liable as carrier, yet he was liable as bailee, for negligence. The goods were left out from Saturday even-ing to Monday morning without protection, at a place where many de-predations had occurred to the knowledge of the defendants. In *Smith* v. *Horne*, (8 *Taunt.* 144; 4 *E. C. L. R.* 50,) it was held that gross neglect will defeat the usual notice given by carriers for the purpose of limiting their responsibility. *Batson* v. *Donavan*, (4 *Barn. & Ald.* 21; 6 *E. C. L. R.* 333.) *Langley* v. *Browne*, (1 *Moore & Payne*, 583; 17 *E. C. L. R.* 193.) A consignee may take charge before arrival; and then I admit the carrier is discharged, as in 4 *Bos. & Pul.* 16. But that was not the case here. *Bradley* v. *Watchhouse*, (*Dan. & Lloyd Merc. Cases*, 3.) *Todd* v. *Figley*, (7 *Watts*, 542.)

For the *defendants*.

This is in effect a motion for a new trial; since there is nothing complained of but that the jury erred upon the facts. I admit that a carrier is bound to deliver personally; but as the court said, the owner shall not give a positive order as to his goods, and then seek to make the carrier liable for obeying the order. These goods were to go to Eagle: the cars were sound and secure; if not interfered with, the cars would have been placed in the warehouse at the basin, in the custody of the keeper. Part of this very train was unloaded

for Borbridge. But here was a positive order to put them on Halde-
man's sideling. This was done, with an offer to deliver, and arrival
at a seasonable time to deliver, as appears by Borbridge's evi-
dence.. The case in *McClelland & Younge*, shows that a carrier
having once tendered the goods, is discharged. The plaintiffs broke
open the cars themselves, showing that they considered that they
had been delivered. (2 *Str.* 1236.) *Ackley* v. *Kellogg*, (8 *Cowen*, 223.)
*Hyde* v. *Trent. &c. Nav. Co.*, (5 *Term Rep.* 389.) The drift of the
plaintiffs' points below was that the court should charge that on the
facts the plaintiffs could not recover, thereby deciding fact and law.
But whether there was evidence of facts discharging the defendants,
was for the jury. The principles of the court were right, and the
learned judge leaned rather in favour of the plaintiffs. *Garside* v.
*Trent. Nav. Co.*, (4 *Term Rep.*, 581.) In re *Webb*, (8 *Taunt.* 443; 4
*E. C. L. R.* 59.) *Dixon* v. *Baldwin*, (5 *East*, 181.)

The opinion of the court was delivered by

Rogers, J.—This is an action of assumpsit against the defendants as
common carriers. The material facts were these : Eagle & Co. pur-
chased goods from Eagle, Westcott & Cambless, which were packed,
marked, and taken to the defendants' store, who undertook to
deliver them to the plaintiffs, merchants living in Columbia, Lan-
caster county. The plaintiffs gave in evidence the receipt of White
& Co., and the bill of lading of the goods : and also proved, that
when the cars came to be unloaded at Columbia, one of the trunks,
No. 445, mentioned in the receipt and bill of lading, was rifled of its
contents. There is no room for doubt that the goods never came to
the possession or custody of the owners ; but it is clear they were
lost after the defendants took charge, and before they were actually
delivered. It was also proved, that the cars which contained the
goods were sent on Haldeman's sideling, by the direction, and at the
request of the plaintiffs, on the evening of Saturday, the 12th of March.

The defence taken at the trial was, that the goods were delivered,
or if not delivered, that the delivery was prevented by the interference
of the plaintiffs, who took charge of the goods before they arrived
at their ultimate place of destination.

A common carrier undertakes generally, and for all people indif-
ferently, to convey goods and deliver them at a place appointed for
him, and with or without a special agreement as to price. He is in
the nature of an insurer, and is answerable for accidents and thefts,
and even for a loss by robbery. He is answerable for all losses
which do not fall within the excepted cases of the act of God,
or inevitable accident, without the intervention of man and
and public enemies. This, as Chancellor Kent remarks in his Com-
mentaries, title Bailment, has been the settled law for ages ; and the
rule is intended as a guard against fraud and collusion, and is
founded on the broad principles of public policy and convenience. It

is a principle of extraordinary responsibility, which has stood the test of experience, and which we are unwilling to see frittered away further than has been already done in those cases where carriers have been, as I think, unwisely, permitted to limit their own responsibility. In the contract of carriage, the defendants engage, for a certain price, to deliver the goods entrusted to them into the actual custody of the plaintiffs. They cannot discharge themselves from their responsibility as carriers, except by proving that they have performed their engagement, or by showing clearly that they are excused from the performance of the contract by some act of the plaintiff, or that the case falls within some of the excepted cases.

The court very properly charged the jury that it was the duty of the defendants, as common carriers, to cause the goods to be actually delivered to the plaintiffs. And that they were not so delivered, scarcely admits of doubt. The cars arrived at the head of the inclined plane on the afternoon of Saturday, and in pursuance of directions from one of the plaintiffs, were placed on Haldeman's sideling, about sundown of that day. The testimony of two witnesses, Haines and Moss, shows, that so far from the goods being delivered, the plaintiffs refused to receive them, on the allegation that they were engaged, and that it was too late to unload the cars. It also appears that the key of the cars and the manifest were retained by the carriers, and that there was no tender or offer to deliver them to the plaintiffs. It must be remarked, as in *Ostrander* v. *Brown*, (15 *John. R.* 48,) the question is not as to the place of delivery, on which I give no opinion, but whether there was any delivery at all. Common carriers are ordinarily bound to carry goods entrusted to their conveyance to the residence or place of business of the consignee; but whether this rule can be conveniently applied to the business usually transacted by canal or railroad, may admit of doubt. *M'Clelland & Younge's R.* 129. *Stone* v. *Cowly*, (5 *T. R.* 394.) It cannot be pretended that there was an actual delivery. But was there any thing proved which is equivalent to an actual delivery? And if there was, it must be in the alleged tender, or because the delivery was prevented by the interference of the plaintiffs.

In *Stone* v. *Cowly*, above cited, it is taken as a general rule, that a carrier, having once tendered a delivery, has discharged himself from his obligation as carrier; because, otherwise, says ALEXANDER, C. B., where is his liability to cease? Where is the line to be drawn, ·if not there? To construe his undertaking in any other way would be attended with the greatest inconvenience: and I would therefore hold the rule to be as stated in ordinary cases. I take no exception to the rule when confined to his extraordinary responsibility as carrier, and with the qualification that the tender must be made at a proper time, in a proper manner and at the proper place. If the tender is wanting in any one of these essential requisites, his responsibility *as carrier* still continues. If this point was made at the time,

no notice is taken of it, in the charge. No question of the kind is submitted to the jury, and whether there was a tender in proper time, is obviously a question, depending as it does on a variety of circumstances, for their consideration. The cars were put on the sideling at or perhaps after sundown, on Saturday; and it is in testimony that it would take at least two and perhaps three or four hours to unload them and remove the contents to the plaintiffs' store. It would be for the jury to say whether the reasons given for refusing to receive the goods were sufficient to excuse the plaintiffs. A tender merely of the goods, to the consignee, as is said in *Ostrander* v. *Brown*, (15 *John. R.* 43,) without their acceptance, would not be a performance of a carrier's duty. And in case of the refusal of the consignee to receive the goods, he is not justified in abandoning them. Although his strict accountability as carrier may cease, he becomes a bailee, and as such must take ordinary care of the goods. We cannot avoid seeing, that in this case neither party supposed the goods were delivered, or that the responsibility had ceased. This was an after thought, after the loss had been incurred, when, as is usual, the ingenuity of the carrier was tasked to find reasons to escape from the consequences of the negligence of his agents.

The court gives an affirmative answer to the several propositions of the plaintiffs, but always with a qualification of which the plaintiffs complain. To the first point, they say, " But the defence taken here renders it necessary for me to add, that if the usual and proper steps towards an actual delivery were prevented by the interference and conduct of one of the plaintiffs, the rule is not applicable; and the jury will decide the facts. The consignee may take charge of the goods before they arrive at their ultimate place of delivery, and the carrier's risk will then terminate." And again, to the second point, the court, after instructing the jury that placing the cars on Haldeman's sideling was no delivery to the plaintiffs, add, " But if they were so placed by the plaintiffs' direction, and an actual delivery was thereby prevented, such delivery could not be required." In this, I understand the court to instruct the jury explicitly, that if they believe the cars were put at the place directed by one of the plaintiffs, the carrier's risk terminated; which was in fact equivalent to instructing them to find for the defendant. They put the case entirely on the interference and conduct of the plaintiffs, whereby an actual delivery was prevented, and on the consignee taking charge of the goods before they arrived at the ultimate place of destination. I have looked through the testimony in vain for any evidence on which the court could submit such a point to the jury, and find nothing on which it can be raised except the direction that the cars should be put upon Haldeman's sideling. On this part of the case, I throw out of view the point that the plaintiffs began to unload the cars before the arrival of the agent, on Monday, because that is only material as bearing on the question, if it be one, whether

(Eagle *v.* White.)

the goods were lost while in the custody of the defendants. It cannot affect this point, because it took place after the goods had been stolen, or lost, and of course after the carrier's responsibility had attached. If the defendants were injured, which is not very clear, this is not the mode or manner to seek redress. I agree that if a carrier is prevented by the owner from performing his contract, or if the owner takes charge of the goods before their arrival at their place of destination, his responsibility *as carrier* ceases; but I cannot admit that there is any evidence in the case, from which the jury should be permitted to make any such inference. The direction given amounts to nothing more than a designation, or at any rate a change, of the place (acquiesced in by the carriers) where the goods were to be delivered. It was not supposed by either that it excused him from a delivery at all. His duty to deliver remained entirely unchanged. A designation, or change, in the place of delivery, or an alteration in the destination, which the owner undoubtedly has a right to make, may, under certain circumstances, be a reason for refusing to obey the instructions, or of charging an additional compensation for the increased trouble or risk, but it cannot be considered as operating so as to exempt him from the responsibility attached to his character as a common carrier, when he obeys the directions of the owner without-objection. If we once permit carriers to relieve themselves from the consequences arising from their or their agents' negligence, there will be no want of pretences and excuses for that purpose, proved, as they can readily be, by the oaths of the persons whose fault or fraud has caused the loss. To avoid all temptations of this kind, the rule which places common carriers on a different footing from other bailees, has been wisely adopted, and must be firmly enforced. The great and increasing extent of our internal trade renders all such questions extremely important; and there is great danger in relaxing the ancient rules, which must end in producing uncertainty, and of course numerous and perplexing controversies.

Huston, J.—This suit was instituted to recover the value of a box of merchandise delivered by the plaintiffs, to be carried to Columbia, in this state, and there delivered to the plaintiffs.

And first, it appears that when the property arrived at Columbia, the carrier was not to deliver it at the door of the owners. The rail-road did not in any way approach nearer than thirty or forty yards of the plaintiffs' store, and the plaintiffs employed the drays or wagons to receive it from the cars and carry it to their store. They did not allege that the defendants were to do this. Three cars were loaded with goods belonging to the plaintiffs, or consigned to them. It appears that after arriving in Columbia, there is a sideling, *i. e.*, a side track, which approaches nearer to the plaintiffs' store than the main track of the state. This is the private track of Mr. Haldeman. Stephen

Eagle, when the goods were near to Columbia, saw the owner of the cars and told him he had got permission from Haldeman to put the cars on Haldeman's sideling: that was the nearest point to the plaintiffs' store to which a car could be brought. The cars were put at this place, and the plaintiffs notified of it. It was then about sundown, and the plaintiffs said it was too late to unload, and besides, they were busy; and it was agreed that the carrier should come on Monday morning and unload. He did come, but before he arrived, Eagle had procured a key, opened and unloaded two of the cars. In doing this, he discovered that one box had been broken open and the goods in it stolen. It was further proved, that if Eagle had not interfered and given directions to put the cars on Haldeman's sideling, they would have been taken to Borbridge's warehouse and put into it, under the care of him or his keeper, and that two other cars, brought in the same train, and not consigned to Eagle, were taken to that warehouse and unloaded there, and the goods found safe. It was further proved, that if the goods had been taken to this warehouse, the cost to Eagle & Co. would have been 2½ cents per hundred pounds. He saved this by putting the cars where he ordered them.

This is the amount of the testimony. Certain points of law were propounded to the court, and each of them answered. The first was, "It was the duty of the defendants as common carriers to cause the goods to be actually delivered to the plaintiffs." The court said, "this is true; but the defence here renders it necessary for me to add, that if the usual and proper steps towards the actual delivery were prevented by the interference and conduct of one of the plaintiffs, the rule is not applicable, and the jury will decide the facts. The consignee may take charge of the goods before they have arrived at the ultimate place of destination, and the carrier's risk will then terminate."

I refer to the statement of the case for the other points and answers, which are all in substance the same, and all present the same question, viz., whether any substantial interference by the owner such as directing a different route or a different place of leaving the goods overnight, does not discharge the carrier, so far as relates to what occurred on that route or at that place, without any fault of the carrier. I am not disposed to alter the general liability of carriers; but one exception has been made, and I would adhere to it; I mean in cases in which the owner takes the direction and management from the carrier. The carrier is answerable for every accident and misfortune to the goods, arising from any cause other than the act of God or a public enemy; among other reasons, because he has the exclusive direction of the route and place of deposit at night; but if the owner can interfere and change these, the carrier is to answer to the owner for the acts of the owner; that is, he is to answer not only for himself, but to another, for what that other did.

(Eagle v. White.)

It will not do to inquire whether the direction of the owner increased the risk, though in this case it obviously did. In a case of such general occurrence, there must be a general rule; he who does an act, or occasions it to be done, must bear the consequence; it will not do to take the direction and make another answer for the event. Any interference must discharge the carrier, if it changed the risk, or even if to all appearance it did not change it, or no interference of the owner can have that effect; so any deviation discharges the insurer, though done by the agent or captain, without the knowledge of the insured. The facts were not stated so as that there was any direct contradiction of the witnesses, but the witnesses used different expressions. The judge must leave this testimony to the jury; and his opinion is in substance this: The usual mode and proper mode was to put these goods overnight in a warehouse. If you believe from the testimony, that the carrier would have so placed them, and was prevented from taking care of them, and left them in the public street of Columbia by the direction of the plaintiffs, and one box was stolen, the fault is not that of the carrier, but of the owner, and he must bear the loss which he occasioned. It matters not whether Eagle ordered them to be put on Haldeman's sideling, because it was near his own store, or because it saved him the price of storage. He ordered it; and I can see no reason why he shall make another pay for a loss which arose in consequence of the owners' order, and not from any act of the carrier. I say, in consequence of the owners' order, for it occurred where he directed the cars to be placed. The goods put in the warehouse were found there in safety.

Judgment reversed; and a *venire de novo* awarded.