## Martin *v.* Philadelphia, Appellant.

*Negligence—Municipalities—Broken electric wire—Act of God—Province of court and jury.*

1. Such inevitable accidents as cannot be prevented by human care, skill or foresight, but which result from natural causes, such as lightning and tempest, floods and inundation, are acts of God, for which no one is responsible, except where a human agency is combined with it, and neglect occurs in the employment of such agency. However,

to excuse from liability, the act of God must be the proximate and not the remote cause of the injuries sustained.

2. When the evidence presented on the trial of an accident case shows that the sole and proximate cause of the plaintiff's injury was an act of God, and in reaching this conclusion there is no question of the credibility of witnesses involved, the case is purely one of law for the court to decide, and if such an uncontested question is submitted to a jury and is followed by a verdict which is manifestly against, not only the weight, but against all the credible evidence in the case, it is the duty of the court to set such a verdict aside, and enter such a judgment as should have been directed on the trial.

3. In an action against a city to recover damages for personal injuries sustained by the plaintiff's hand coming in contact with a broken electric wire belonging to the city, it is error to submit the case to the jury where the evidence showed that the wire at the time of the accident hung about a foot above the sidewalk, that it had been in that position about twenty-six hours; that the condition of the wire had been reported to a police station near by about eleven hours before the accident; that the wire had been broken by a snowstorm, the most severe ever recorded; that all telephone, electric and trolley wires had been dismantled within the city; that all street traffic had been blocked for over a day before the accident; that the city had used all available men in its employ to make repairs; and that it was not possible to get additional qualified men, because all such men were employed by private companies.

Argued Dec. 12, 1912. Appeal, No. 117, Oct. T., 1912, by defendant, from judgment of C. P. No. 4, Phila. Co., Dec. T., 1909, No. 4,054, on verdict for plaintiff in case of Nicholas Martin, by his next friend and uncle, Angelo Venafra, v. City of Philadelphia. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD and PORTER, JJ. Reversed.

Trespass to recover damages for personal injuries. Before CARR, J.

The circumstances of the accident are stated in the opinion of the Superior Court.

Verdict and judgment for plaintiff for $1,000. Defendant appealed.

*Error assigned* was in refusing defendant's motion for judgment n. o. v.

*Paul Reilly,* assistant city solicitor, with him *Thomas Boylan* and *Michael J. Ryan,* city solicitor, for appellant.

*Joseph L. McAleer,* for appellee.

OPINION BY ORLADY, J., October 13, 1913:

The undisputed facts of this case are so out of the ordinary that it is necessary to keep them clearly in mind in determining the liability of the defendant. About eleven A. M. on December 27, 1909, the plaintiff, a boy of eleven years, left his home, a short distance from the corner of Sixth street and Passyunk avenue, in the city of Philadelphia, to go to a store to purchase bread. When at the corner of the street he slipped on an icy pavement and fell, his right hand coming in contact with a broken wire which was heavily charged with electricity, and caused a permanent injury from the shock then received. The wire was hanging about a foot above the sidewalk, and had been in that position about twenty-six hours previous to the accident. The condition of the wire had been reported to a police station house of the district about eleven hours before the accident. This action was instituted to recover damages from the city by reason of its negligence in not repairing and replacing the wire. A verdict of $1,000 was returned in favor of the plaintiff, and the court dismissed the defendant's motion for judgment non obstante veredicto.

It was shown in defense and conceded by the plaintiff, that on December 25, 1909, there was the most severe snowstorm ever recorded in the United States Weather Bureau, which affected all of the city of Philadelphia, and it continued with unabated violence until late in the night of December 26, 1909. While the temperature was not low enough to be called a blizzard by the Weather Department Bureau, the wind and unusual fall of snow were of sufficient violence to dismantle all telephone, electric and trolley overhead wires, and put out of commis-

sion all service, whether for city or private business. The snow fell for twenty-four hours. The maximum velocity of the wind was thirty-six miles per hour, which caused heavy drifts, and was so extraordinary and unusual in its effects that it blocked all street traffic for a number of days.

Complaints of defective service were made from all parts of the city by a large number of persons, but there was not force enough in the departments to keep a record of the broken wires, as they came in by hundreds to the electrical bureau of the city. The condition was the same with electric light, telegraph and telephone wires. The electrical bureau, or department representing that branch of the city government at that time had in its employ about thirty available men, who were immediately put at work and continued on duty from December 25, 1909, until after December 29, 1909, working the first few days nearly the whole of the twenty-four hours of each day. This force had proved sufficient to control any ordinary electrical or storm disturbance, but it was not possible to secure additional men, who were qualified to do such work, because all of the other companies requiring similar services were in the same condition, and drew all of their reserve force to restore their own service. As stated by an official of the department, "Everything overhead was crippled, men worked twenty-four hours a day, and the department was helpless to relieve it. The whole city was so seriously affected, and all service was so crippled that street and overhead wire service was at a standstill for several days."

There was no dispute in regard to any fact, and no question as to the credibility of any witness. The vital and controlling physical conditions were unchallenged and the unusual phenomenon was well known to all people. The defendant claimed exemption from any liability by reason of this state of affairs, being an act of God. In his charge to the jury, the trial judge said: "If you believe that, that it was an act of God, the kind

of accident for which the city should not be responsible because it did not come from the city's negligence, the want of due care in watching conditions and making repairs, then there could be no negligence in this case, and you should find for the defendant."

It is not necessary to consider the plaintiff's alleged contributory negligence, or the question of notice of the broken wire being given to the city. The defense pure and simple was, that this was such an extraordinary and unprecedented storm that it made it physically impossible for the city to repair all of the dangerous and broken wires at the time of the plaintiff's injuries, and that they had exhausted all available means at their hands to accomplish this result, and restore the streets of the city to a safe condition for use by the public.

Such inevitable accidents as cannot be prevented by human care, skill or foresight but which result from natural causes, such as lightning and tempest, floods and inundation are termed acts of God, for which no one is responsible, except where a human agency is combined with it, and neglect occurs in the employment of such agency. However, to excuse from liability, the act of God must be the proximate and not the remote cause of the injuries sustained.

The liability of municipalities and common carriers under similar facts has been presented to the court in many and varied cases, and where it has been established by undisputed proof or admitted as a fact that the flood, storm or other natural agency was unusual and uncontrolled, it has been universally held that there was no liability for the injuries produced. See Libby v. R. R. Co., 20 L. R. A. 812; Blythe & Lehman v. R. R. Co., 11 L. R. A. 615; Cormack v. R. R. Co., 24 L. R. A. (N. S.) 1209; Willson v. Boise City, 36 L. R. A. (N. S.) 1158; Chicago, Rock Island & Pacific R. R. Co. v. McKone, 42 L. R. A. (N. S.) 709; sec. 1, Am. & Eng. Ency. of Law, 584, and the large number of authorities in the annotations to these cases. Also Baltimore & Ohio Railroad Co. v,

School District, 96 Pa. 65; Helbling v. Cemetery Co., 201 Pa. 171.

The term, act of God, has received a variety of definitions, differing rather in the mode of expression than in the substance. It is accepted by text writers and courts to be, "That which is occasioned exclusively by the violence of nature—that kind of force of the elements which human ability could not have foreseen and prevented, such as lightning, tornado, excessive rain or snowfall and the like, and which implies an entire exclusion of all human agencies,—with which the control of men has nothing to do,—which could not have been occasioned by the interference of men, and proceeds from physical cause alone: New Brunswick Steamboat & Canal Transportation Co. v. Tiers, 24 N. J. 697; s. c. 64 Am. Dec. 394.

In the last cited case, the court says: "What is or is not an act of God that will excuse a common carrier for a loss happening in consequence of it, is said to be generally a question of law. For the better security of the public, and in consideration of the fact that the owner of goods is usually unable to prove the cause of the loss, which is commonly known to the carrier's own servants, who have every inducement to excuse themselves, common carriers are not only subject to the responsibility of taking all reasonable care of goods entrusted to them, but are liable as insurers, and can only excuse themselves by satisfactory proof of one or the other of two things, namely, an act of God, or of public enemies. By the act of God is meant a natural necessity which could not have been occasioned by the intervention of man, but proceeds from physical causes alone, such as violence of the wind or seas, lightning or other natural causes."

And in Wolf v. American Express Co., 43 Mo. 421; s. c., 97 Am. Dec. 406, the rule is stated to be, "The act of God which excuses the carrier must not only be the proximate cause of the loss, but the better opinion is that it must be the sole cause, and where the loss by the act of God, if the negligence of the carriers mingles

with it as an active and co-operative force he is still responsible." See also Chicago, Rock Island & Pacific R. R. Co. *v.* McKone, 42 L. R. A. (N. S.) 709.

In Nugent v. Smith, 34 L. T. Rep. (N. S.) 827, s. c., reported in note to Chicago & Northwestern R. R. Co. v. Sawyer, 69 Ill. 285, 18 Am. Rep. 613, the question, "was the defendant, common carrier, liable for loss of a mare injured in transition during a storm at sea?" COCKBURN, C. J., concisely declares the law as follows: "The definition given, of what is termed, the act of God, is that it must be such a direct, and violent, and sudden and irresistible act of nature as could not by any amount of ability have been foreseen, or if foreseen could not by any amount of care and skill have been resisted," and after a careful analysis of the evidence, concluded that the judgment recovered by the plaintiff must be reversed and entered for the defendant, because the carrier is not liable where the thing carried perishes or sustains damages by reason of some quality inherent in its nature, without any fault of his which it was not possible for him to guard against, and further, if the fright of the mare was the natural effect of the storm and the agitation of the ship, then it was the immediate consequence of the storm, and the injuries occasioned by the fright are sufficiently closely connected with the storm, in other words, the act of God, to afford protection to the carrier." Lord Mansfield in Forward v. Pittard, 1 Durnford & East's Rep. 27, states the proposition as follows: "To prevent litigation, collusion, and the necessity of going into circumstances impossible to be unraveled, the law presumes against the carrier unless he shows the loss was entirely due by the king's enemies, or by such an act of God as could not happen by the intervention of man, as storms, lightning, tempests and the like."

This rule and the construction of it has been adopted by our own courts. In Gordon v. Little, 8 S. & R. 533, Mr. Justice DUNCAN says: "By the act of God, is understood that loss occasioned by some act beyond the

control and power of men to prevent; some action of the elements, something more than human acts—tempests, sudden and violent gusts of wind, lightning, etc." And in Eagle v. White, 6 Whart. 505, ROGERS, J., says: "A common carrier is answerable for all losses which do not, fall within the excepted cases of the act of God, or inevitable accident, without the intervention of man and public enemies." See Coggs v. Bernard, 1 Smith's Leading Cases, 369, and notes.

There is a dearth of authorities on the question directly presented, but we hold it to be good law as well as common sense, that when the evidence presented on the trial leads to but one result—that the sole and proximate cause of the plaintiff's injury was an act of God, and in reaching this conclusion there is no question of the credibility of witnesses involved, that it is purely a question of law for the court to decide and that such an uncontested question should not be submitted to a jury for decision, and when it is so erroneously referred, and followed by a verdict which is manifestly against not only the weight but against all the credible evidence in the case, that it is the duty of the court to set it aside and enter such a judgment as should have been directed on the trial.

Great disasters, such as that known as the Johnstown flood, of May 31, 1889, New York blizzard of March 11–14, 1888, Galveston tidal wave of 1900, or the Dayton flood of 1913, are such overwhelming and unprecedented casualties in terms and effect that their designation should not be left to the caprice of a jury. The act of God which exempts a common carrier from liability would for like reason relieve a municipality. The negligence of the party sought to be held liable is the basis of the action in either case, and when the injury is the sole result of a cause which could not be prevented by human agencies, the defendant by whatever name it may be called should not be held liable.

In so deciding we are not unmindful of a class of cases

which appear to hold to the converse of our conclusion. In Lehigh Bridge Co. v. Coal Co., 4 Rawle, 7, GIBSON, C. J., states: "Where a loss happens exclusively from an act of Providence, it will not be pretended that it ought to be borne by him whose superstructure was made the immediate instrument of it. . . . The concurrence of negligence with the act of Providence, where the mischief is done by flood or storm is necessary to fix the defendant with liability. In the case at bar, then, it will be for the jury to inquire whether the defendant used all proper precaution to prevent consequential injury:" Bell v. McClintock, 9 Watts, 119; Forster v. Bridge Co., 16 Pa. 393.

In Phila. & Reading Railroad v. Anderson, 94 Pa. 351, it was urged by the defendant that the accident was occasioned by a condition of things which the company could neither foresee nor provide against; that it was the immediate result of a great rain storm which occurred at that time, a storm unprecedented in the history of the country and one which set at defiance all human skill and prudence. The Supreme Court said: "This, however, was the very point in controversy, and the learned judge told the jury that if the facts were as above stated, they must find for the defendant." See also Blythe & Lehman v. Railroad, 11 L. R. A. 615, and notes.

In the case before us the trial judge said in substance the same, but in this case it was not a controverted, but an admitted situation, free from dispute or doubt. Of what avail would it be to submit such a proposition to a jury without any evidence to gainsay it? In all the cases brought to our notice by counsel, or by our own research, we find no material difference in the rule of law. If there is substantive evidence of the calamity not being of the grade and character to be designated an act of God, or if any human agency under the control of the defendant contributes in any way to the hazard, it should be left to the jury for determination, and when as in this case it is not denied by any evidence that the

injuries are solely caused by a disaster properly called an act of God, the court should so declare and instruct the jury accordingly.

When it is inconceivable that any two minds could rationally draw more than one conclusion from the established facts, then a decision contrary to such conclusion is merely capricious and cannot be sustained: Joyce v. B. & O. R. R. Co., 230 Pa. 1.

The remedy for an erroneous or a perverse verdict is to set it aside: Richards v. Willard, 176 Pa. 181. Verdicts are not to be rendered in obedience to prejudice or sympathy, and trial courts should deal with them in a firm and decisive manner, and should reject erroneous verdicts without the least hesitation or delay, otherwise the administration of justice is brought into public contempt and dishonor. In the administration of justice between parties and parties, the duties and powers of the trial judges come much closer to the individual, and in that sense are more important to them than our own. Our duty is to administer justice in that broader scope that is involved in the preservation of the stability of legal rules, and uniformity in the interpretation of the law. It is ours to declare the law, but the duty to see that juries obey it is upon the judges who preside at the trial, and the power to enforce such obedience is one which should be unflinchingly exercised by the appropriate method. If trial judges permit erroneous verdicts to ripen into judgments our duty then is to set them aside: Holden v. R. R. Co., 169 Pa. 1; Kohler v. R. R. Co., 135 Pa. 346.

The fact that notice was given at a police station eleven hours before the plaintiff sustained his injuries is not material, inasmuch as it was not shown that the notice was received by the electrical bureau having charge of this part of the city affairs, and further, the testimony shows that at the time the plaintiff received his injuries, the city was yet in a state of helplessness from the storm, though it was recovering from this disaster as rapidly as human agencies would permit.

The place of first or subsequent repairs to broken wires, must necessarily be left to the judgment of the electrical bureau, and a jury should not be permitted to say that this wire at Sixth and Passyunk avenue should have been repaired before others in a similar condition, there being no suggestion that any repairs were unduly delayed.

The act of God, in this particular case, was of such an overwhelming and destructive character, and was independent of any negligence alleged or shown to produce the injury, that there was no liability upon the city for failing to do an admittedly impossible thing.

The assignment of error is sustained, the judgment entered by the court below is reversed and judgment is now entered in favor of the defendant.

RICE, P. J. and HENDERSON, J. dissent.