# Campbell *v.* Western Union Telegraph Company, Appellant.

554

Argued October 24, 1939.

Before Cunningham, Stadtfeld, Parker and Rhodes, JJ.

*George H. Hafer,* with him *Arthur H. Hull,* of *Snyder, Hull, Leiby & Metzger, Berger & Sinon* and *Francis R. Stark,* for appellant.

*Paul Cauffiel,* for appellee.

Opinion by Rhodes, J., April 18, 1940:

Plaintiff brought this action to recover damages for personal injuries suffered as the result of an accident which occurred in the manner hereinafter described. At the close of the trial defendant presented a point for binding instructions which was refused, and the jury rendered a verdict for plaintiff. Defendant's motion for judgment in its favor n. o. v. was dismissed, and it

has appealed, assigning as error the refusal of its point and the overruling of its motion.

Appellant's contention is that the doctrine of res ipsa loquitur has no application in the instant case, and that appellee did not meet the burden of proving that his injuries resulted from the negligence of appellant. Appellee concedes that the doctrine of res ipsa loquitur was not involved or raised by him, but takes the position that there was submitted to the jury affirmative testimony of negligence in the maintenance of appellant's line. Therefore, the only question for our determination is whether there was sufficient evidence to sustain the jury's verdict.

Between 4 and 5 p. m. on March 20, 1936, appellee and five other men were seated in a portable cab in the body of a one and one-half ton Chevrolet dump truck. The portable cab consisted of a framework covered with canvas, having seats on either side. It was not fastened to the truck, and was removed during the day when the truck was in use as a dump truck, being placed in the truck morning and night when the men were being conveyed to and from work. The truck was equipped with the usual permanent cab, and the portable cab was obviously designed to shelter those who rode as passengers in the body thereof.

At a point on highway route No. 49, between Ulysses and Coudersport, Pa., known as Newfield Crossing, the pole line of appellant is along the right of way of the Baltimore & Ohio Railroad Company. These poles carry two wires, and at the point mentioned they were suspended over the highway between two poles 129 feet apart, the poles being located on opposite sides of the highway.

The evidence indicates, and it is not seriously disputed, that as the truck carrying the portable cab in which appellee and five others were riding was passing the point mentioned, the portable cab and its occupants were swept from the truck to the surface of the road

by a low hanging wire of appellant. After the accident there was a mark near the top of the portable cab indicating where it came into contact with the wire. This mark was 4 to 6 inches above the top of the head gate (a board placed immediately behind the permanent cab to protect it from material being dumped into the body of the truck) which extended two or three inches above the top of the permanent cab. The height of the permanent cab was variously estimated at 6 feet, and 5 feet or more; and the distance which the portable cab extended above it at 1½ to 2 feet. After the accident appellant's wire was only 4 or 5 feet above the surface of the road, and one of appellee's witnesses was able to reach and cut it without difficulty.

There was evidence from which it could be inferred that, at 7:30 a. m. on the day of the accident, one of appellant's wires was less than 10 feet above the road, since, at that time a similar portable cab was swept from a truck at the same point, but resulted in no injury because it was empty. The usual clearance of appellant's wires at this point was over 18 feet.

There was much testimony as to the extent and severity of a sleet storm on March 17th and 18th. One of appellant's witnesses described it thus: "On account of the ice storm the trees were all full of ice—wires all full of ice—trees dropped over the line—took the poles down and broke the wires, too, at some time on the night of the 17th." This witness, a section foreman for the Baltimore & Ohio Railroad Company, whose duties included inspecting appellant's wires and making temporary repairs, testified also that he inspected the wires at Newfield Crossing on the morning of the 20th, and found them "the same as they had been before that," and that no wires were down for a mile west and one-half mile east of the crossing.

Appellant's section lineman observed the condition of the wires at Newfield Crossing between 11 and 12 a. m. on March 17th, at which time he said they "had proper

clearance," and again between 5 p. m. and 6 p. m. on that day. Thereafter the havoc wrought by the storm required his presence at various places along appellant's line, and he did not return to Newfield Crossing until March 27th, at which time he discovered that appellant's wires at that point had been cut. They remained severed from the 20th to the 27th. His examination also disclosed that a bracket to which one of appellant's wires was attached on the east pole was split and tipped slightly. After March 18th a thaw set in, and on the 19th the ice had melted away from the wires.

What degree of care was required of appellant in the maintenance of its wires? Where the wires carry a heavy charge of electricity, the company which uses such a dangerous agent is bound not only to know the extent of the danger, but to use the very highest degree of care practicable to avoid injury to every one who may be lawfully in proximity to its wires and liable to come accidentally or otherwise in contact with them. *Sebok v. Pennsylvania Edison Co.*, 331 Pa. 524, 1 A. 2d 680; *Ashby v. Philadelphia Electric Co.*, 328 Pa. 474, 195 A. 887; *MacDougall v. Pennsylvania Power & Light Co.*, 311 Pa. 387, 166 A. 589; *Fitzgerald v. Edison Electric Co.*, 200 Pa. 540, 50 A. 161.

In 62 C. J. p. 60, §64, it is said: "While it has been held that a telegraph or telephone company must use the highest degree of care practicable in the construction and maintenance of its lines and apparatus, the general rule is that such companies must exercise due, ordinary, or reasonable care in the construction of its lines so as not to injure persons or property, and must also exercise such care in making any necessary repairs and maintaining its line in a safe and proper condition." We think the most rational rule is expressed in the sentence which follows the above quotation: "It has also been held that the care exercised must be proportionate to the danger that may be reasonably appre-

hended from the location and nature of the appliances used and the greater the danger, the greater must be the care." Similar language was used in the McDougall case, supra, at page 396: "Vigilance must always be commensurate with danger. A high degree of danger always calls for a high degree of care. The care to be exercised in a particular case must always be proportionate to the seriousness of the consequences which are reasonably to be anticipated as a result of the conduct in question. Reason does not have to wait on usage; the latter must wait on reason."

In the present case appellant's wires did not carry a dangerous current, nor were they in proximity to such wires. However, at the point of the accident a potentially hazardous condition was created by the suspension of appellant's wires over a public highway. The danger to travelers, in the event that the wires should sag to a level below that of such vehicles as might be reasonably expected to traverse the highway, would seem to be at least as foreseeable as that created by high tension wires over a house in event of fire, as in *Sebok v. Pennsylvania Edison Co.*, supra. Consequently, the care to be exercised by appellant should be commensurate with the peril inherent in the situation.

The possibility, and in the event of ice formation the probability, of appellant's wires sagging and becoming dangerous to travelers on the highway would seem to be indicated by the method of their attachment. The wires were attached to insulators, and the insulators were fastened to brackets on the poles, the wires being laid in a curve on the insulators and tied with a No. 9 iron tie wire.

While appellant would not be liable for an accident caused by a condition of its wires due entirely to an act of God, such as an unusually violent storm (*Martin v. Philadelphia*, 54 Pa. Superior Ct. 563), that rule is not applicable where some negligent act on its part, the natural consequence of which should have been foreseen,

concurred with the storm in producing the loss (*Laritza v. Pennsylvania Power Co.,* 106 Pa. Superior Ct. 587, 596, 597, 162 A. 333). The ice storm on March 17th and 18th called for the exercise of unusual vigilance, especially where appellant's wires crossed the highway, because of the potential hazard, with knowledge of which appellant must be charged. Under all the circumstances, failure to inspect the condition of these wires over the highway during the day of March 20th, when it was being used by many travelers, or to inspect carefully, or to make the repairs demanded by careful inspection, was sufficient to establish appellant's negligence. There is no evidence that men were not available to perform the work of inspection and repairs which the exigency of the situation demanded. The section foreman testified that his inspection of the wires at Newfield Crossing on the morning of the 20th was at 7:30 a. m.; that he and his crew on a motor car traveled first to a point about one-half mile east of the crossing, and then turned about and proceeded to a point eight miles west of the crossing; and that his inspection failed to disclose anything wrong. On the other hand, there was testimony by a truck driver that at 7:30 on that morning a portable cab on his truck was caught by a wire which had sagged and tipped off the truck at the Newfield Crossing. The credibility of the witnesses was for the jury, and it was for the jury to draw all reasonable and legitimate inferences from the facts established.

The court below properly submitted the issues for the jury's determination, and the evidence is sufficient to support their verdict.

Assignments of error are overruled.

Judgment is affirmed.