## Brown v. Krakowski

*John A. Gallagher* and *Howard E. Kennedy*, for plaintiff.

*M. F. McDonald, Sr.*, and *John L. McDonald*, for defendants.

PINOLA, J., July 26, 1949.—This is an action in trespass brought by Richard Brown to recover for injuries sustained by him as the result of the alleged negligence of defendant, George Krakowski, in running a truck into a cable fastened to the pole on which plaintiff was working.

At the conclusion of plaintiff's case, the trial judge denied a motion for nonsuit, but at the end of the trial he directed a verdict for defendants. We have before us plaintiff's motion for new trial.

Defendants, George Krakowski and the Pennsylvania Truck Lines, Inc., sought to bring in as addi-

tional defendant the Pennsylvania Power & Light Company, plaintiff's employer, averring that it was solely responsible for the accident. On August 26, 1948, this court sustained objections of the light company because as employer of plaintiff it could only be responsible to him under the Workmen's Compensation Law. No appeal was taken from that order (40 Luz. L. R. 311).

A short time before February 19, 1946, employes of the light company had erected a pole adjacent to the highway between Wapwallopen and Nescopeck, in this county. On the morning of that day the work truck of the light company was stationed on the easterly side of the highway and from that truck its employes, under the direction of plaintiff and a coworker, Francis Quinn, extended a half-inch wire cable across the street, in a westerly direction, to a point 4½ feet from the top of the pole, which was 25 feet high from the surface. This cable bisected the easterly side of the highway at a height of between 9 and 10 feet, and plaintiff's witnesses said it bisected the westerly side at a height of 25 feet. This, however, was not physically possible because the cable was attached to the pole at a height 20½ feet from the surface, and since the pole was five feet from the westerly side of the highway, the cable could not have bisected that side of the highway at a height of 25 feet.

At about 10:20 a.m., four employes of the light company left the truck simultaneously. Plaintiff and Quinn walked across the street to the pole, and Alexander Korba and Alfred Thomas walked down the street in a southerly direction to another pole 300 feet away. Plaintiff claimed that it took him only a second or two to cross the street and climb to the top of the pole, which he had barely reached when the pole broke and he was thrown across the street onto the work truck. Thomas testified that from the time he left the truck and went to the second pole and climbed it and

saw the transformer shake, one minute had elapsed. Korba said he had reached the second pole and climbed up two steps when the accident occurred.

The highway at the point in question runs approximately in a northerly and southerly direction; it was surfaced with macadam, commonly known as black top, about 18 feet wide. The pole on which plaintiff was working was located approximately five feet from the westerly edge of the macadam and a guard rail was about three feet from the westerly edge of the macadam. The work truck was parked approximately two feet from the easterly side of the highway. The steel cable was wound on a drum at the rear of the cab. It ran off along the middle of the floor to the rear where it passed through a pulley. The floor of the work truck was three feet from the ground and the pulley through which the cable ran was one foot from the floor, so that the cable left the truck at a point which was four feet from the ground and six feet from the easterly edge of the highway.

The highway, in the northerly direction from the pole, was approximately straight for a distance of between 500 and 600 feet. On the day of the accident, the pavement was dry, the weather was clear and cold, and the sun was shining. Plaintiff testified that at a point 200 feet north of the pole he had located a warning sign 2 feet high, 18 inches wide with a red flag upon it. It had a yellow background, containing in black letters, the words, "Men Working". He admitted that no warning was given indicating the height of clearance on the cable at any point.

Defendant George Krakowski was the operator of a truck owned by the Pennsylvania Truck Lines, Inc., the other defendant. He was traveling in a southerly direction from Mocanaqua. When he approached the "Men Working" sign, he slowed down to 20 miles per hour and moved over slightly to the left because he saw

Quinn at the foot of the pole. He saw a group of three service lines which crossed the highway, but he did not see plaintiff on the pole nor did he see the cable.

The truck which he was operating was between 7 and 7½ feet wide and 10 feet 4 inches high. As he moved along the cab struck the cable at a point 4 inches from the top causing the cable to break and at the same time pull down the pole.

Plaintiff contended that defendant was negligent in operating the truck at a reckless speed, that had he gone slower he would have seen the cable, that he did not have the truck under control, that he operated the truck on the wrong or left side of the highway, and that he had failed to heed the warning sign.

In the opinion of the trial judge, plaintiff had failed to meet the burden of proof. The mere happening of the accident did not prove negligence. "A jury cannot be permitted to find anything negligent which is less than the failure to discharge a legal duty"; for recovery can rest only on such failure: Neal v. Buffalo, etc., Ry. Co., 289 Pa. 313.

In order that one may be held liable for negligence, it is essential that the duty breached should have been a duty which he owed to the person injured: 45 C. J. 647, §21.

It may well be that there was no duty to plaintiff, who was on top of a 25-foot pole outside of the highway. See Eldredge, Modern Tort Problems, p. 15, "The Orbit of the Duty".

Even if Krakowski was negligent, plaintiff just happened to be on top of the pole; men are not usually perched upon poles alongside of highways.

As Judge Cardozo said in Palsgraf v. Long Island R. R. Co., 248 N. Y. 339, 162 N. E. 99:

". . . . an act innocent and harmless, at least to outward seeming, with reference to her, did not take to itself the quality of a tort because it happened to be a

wrong ... with reference to someone else. ... The orbit of the danger as disclosed to the eye of reasonable vigilance would be the orbit of the duty."

This theory was adopted by the A. L. I. Restatement of the Law of Torts, §281, comment c, which was approved in Harris et ux. v. Lewistown Tr. Co. et al., 326 Pa. 145, 152, where Justice Drew said:

"A breach of duty owed to one class of persons cannot create a cause of action in favor of a person not within the class. A plaintiff must show that as to him there was a breach of duty: Restatement, Torts, supra, section 281, comment (c); Venzel v. Valley Camp Coal Co., 304 Pa. 583; Palsgraf v. Long Island R. R. Co., 248 N. Y. 339."

In any event, considering the duty of the driver of the truck to use ordinary care, the trial judge was of the opinion that the state of facts showed the absence of negligence on the part of defendant so clearly that there is no room for fair and sensible men to differ in their conclusions from the available data: Caulton v. Eyre & Co., Inc., 330 Pa. 385.

Moreover, although the trial judge was in doubt, we are of the opinion that plaintiff did not present a case free from contributory negligence.

In Haszczyn v. Detroit Creamery Co., 281 Mich. 467, 275 N. W. 211, where, in violation of a statute forbidding wires to be placed at less height than 15 feet above the traveling portion of a road, a city foreman stretched a rope from the top of a tree located on the curb lawn to a place on a pole five feet above the ground across the street. The rope was struck by a truck and the foreman was thrown down and hurt. There the court held that the foreman's contributory negligence was a question for the jury, because there was evidence that the foreman had taken some precaution to guard against possible injury resulting from the unusual condition.

While plaintiff said he did not erect the cable, Korba, his witness, said that it had been erected under plaintiff's direction and that of a fellow employe, Quinn. On cross-examination, he testified.

"A. Well, that is about the only ones that had any direct connection with that cable. Brown and Quinn; they were the ones that had direct control of that job, putting the cable across the street, I mean.

"Q. When was it installed?

"A. You mean the date?

"Q. Yes.

"A. February 19, 1946.

"Q. What time?

"A. Between 9:30 and 10.

"Q. Between 9:30 . . . .

"A. Yes, and 10 a.m. I didn't have my watch out."

Here there is no evidence of any attempt to give a warning of the presence of the cable, and plaintiff, having directed the erection of the cable, should have known that what actually happened to the truck involved might happen. If defendant were negligent, plaintiff would be guilty of contributory negligence.

As for the operation on the wrong or left hand side of the highway, Quinn, who was working at the base of the pole, testified that as the truck went by him it was 7 to 8 feet from him. From this fact, counsel for plaintiff would have us conclude that defendant Krakowski necessarily was operating his truck on the left hand side of the road. This does not follow. According to Quinn, there was a space of two feet between the guard rail and the pole and he stood 18 inches from the pole or 6 inches from the guard rail. Therefore, when the truck passed him, at a distance of eight feet, it was 9½ feet away from the center or white line. Hence 4½ feet of his truck was to the right of that line. If the truck were 7 feet wide, 2½ feet of its width was to the left of the center line. If the truck were 7½ feet

wide, then at most 3 feet of it was to the left of the center line.

Plaintiff insists there is other evidence that defendant Krakowski operated his truck on the wrong or left hand side. While Krakowski testified that the truck only went 18 feet after striking the cable, plaintiff's witness Korba testified that after the accident the truck was 150 feet south of the pole and on the left hand side of the road, about two thirds of the truck being to the left of the white line. His witness Thomas said the greater portion of the truck was to the left of the white line, but his witness Quinn testified that when the truck stopped it was in the middle of the road.

Believing plaintiff's witnesses, it does not follow that because the truck was on the left hand side of the road when it stopped at a point 150 feet from the pole, that it was being operated on the left hand side of the road when it was opposite the pole and struck the cable.

Counsel for plaintiff also insist that the fact that the part of the cable remaining attached to the top of the pole was 23 feet long indicates that the cab struck the cable at the left side of the road. This is not a fair inference, because, as everyone knows, when pressure is exerted against a wire or a rope, it will not always break at the point of application of the pressure. It will break at the weakest point in the wire or rope.

Moreover, if the extended cable be taken as the hypotenuse of a triangle, with the distance from the easterly side of the road to the pole (23 feet) as the base, and the height of the pole (25 feet) as the vertical side, the cable would be 25½ feet long at the easterly side of the road and 9 feet above it, if the rope were attached to the pole at a point 20 feet from the road, while if it were attached at a point 24½ or 25 feet, the cable would be 28 feet long. Therefore, the length of the 23 feet piece of cable does not warrant the inference that

the truck struck the cable at the easterly side of the road.

We agree with the trial judge that plaintiff failed to prove that defendant Krakowski was driving on the wrong side of the road and he failed to prove that such driving caused the accident. In this respect he failed to sustain his burden.

Plaintiff also claimed that the truck was operated at an excessive rate of speed and that the operator was negligent in failing to stop it within the assured clear distance ahead.

The operator declared positively that he was traveling 20 miles an hour when he struck the cable, and that he stopped within 18 feet. Plaintiff's witnesses said he stopped 150 feet away. At 20 miles per hour the truck would negotiate 150 feet in approximately 5 seconds.

"Section 1002 of the Vehicle Code of May 1, 1929, P. L. 905, and its amendments, 75 PS 501, provides, inter alia, that 'no person shall drive any vehicle upon a highway . . . at a speed greater than will permit him to bring the vehicle to a stop within the assured clear distance ahead'. The assured clear distance rule has been the law of Pennsylvania for many years. It was established as a common law principle and imbedded in our law by the above statute. . . . The assured clear distance rule requires that a driver keep his vehicle under such control that he can always stop within the distance that he can clearly see. What this distance will be will vary according to the visibility at the time and other attending circumstances": Rich v. Petersen Truck Lines, Inc., 357 Pa. 318.

As pointed out by the court in Smiley v. Arrow Spring Bed Co., 138 Ohio 81, 33 N. E. (2d) 3, this statute is identical with that of Ohio, Michigan and Iowa. Therefore, the decisions in those States are worthy of consideration.

In Thompson v. Kerr, 51 N. E. (2d) 742 (Ohio), the court held that the assured clear distance statute is intended solely for the *protection of persons, vehicles or objects in the same lane of traffic* and has no application to situations where a vehicle properly in a line of traffic suddenly departs therefrom and across the highway ahead of and into the lane of traffic of an approaching vehicle.

And, in Marchal v. Frankman, 58 N. E. (2d) 679 (Ohio), it declared that the assured clear distance ahead is the distance between the motor vehicle of a motorist and *any discernible object obstructing his path or line of travel.*

In Anderson v. Kist, 229 Iowa 462, 294 N. W. 726, the court held that the rule was not applicable where the trailer part of the truck which was struck was not discernible or where the motorist had the right to assume that the truck would yield one half of the traveled way.

In Smiley v. Arrow Spring Bed Co., supra, the court pointed out:

"The greatest difficulty and confusion in the application of the . . . rule arises in the determination of what circumstances may constitute an exception to it . . . such exceptions must arise out of sudden emergencies which change the situation for the operator of a motor vehicle, but which do not arise by reason of his own failure or neglect to comply with the rule. . . . It is apparent that the exception to the statutory rule, in contrast with the rule itself, cannot be stated in exact terms. It can be stated only relatively and to a large extent by terms of inclusion within and exclusion from the rule, depending upon the circumstances of the case."

The trial judge took the position that the rule did not apply here. The rule is only applicable when there

is a duty on the operator to see what is on the highway in his path or line of travel.

The court said in Stark v. Fullerton T. Co., 318 Pa. 541, 544, of section 1002 of The Vehicle Code:

"This implies that the driver will always be carefully watching *so much of the road* as is included within that 'assured clear distance ahead', and will always keep his car so under control that he can stop it within that distance. (Emphasis ours.) . . . It is no answer to say . . . that decedent had no reason to expect a stalling on the highway of the automobiles into which he crashed."

In our case the obstruction was not on the road and the driver had the right to expect the space above it to be free from any obstruction.

The trial judge properly took the position that there was no duty on the operator to look for plaintiff 25 feet up on the top of a pole outside of the highway, and there was no duty on the operator to look for a thin cable outside of and above the ordinary scope of his vision.

Moreover, even if the doctrine of assured clear distance ahead were applicable to these facts, defendant Krakowski would not be foreclosed thereby because there is no evidence that the cable was discernible by a prudent person exercising ordinary care.

Krakowski testified that in the cab he sat three feet from the ground, that the roof was over him, and as the truck moved ahead, the vertical angle of vision decreased. After seeing the sign his attention was attracted to Quinn standing alongside the highway and he changed the course of the car slightly to the left to give him clearance. He saw the three service wires when he was at the sign and that there was no one near the truck. When he moved the truck over slightly to the left his left wheels were right on the white line and the load caused the truck to tilt to the right. He

did not see the guy wire at all and could not see it because of the mountain background. After a reasonable glance he thought it safe to pass under the three service wires.

Michael Krakowski, brother of the operator, did not see the cable. Whether or not Frank Krakowski, another brother, saw it, does not appear. One thing is certain, that there is not a scintilla of evidence in the record that the guy wire was seen by anyone or could be seen by the operator of a truck seated in a cab in a position such as occupied by Krakowski. On the other hand, there is positive testimony of the operator and that of his brother Michael that they did not see the wire and their explanation for not seeing it is reasonable. In fact, it is borne out by an examination of the pictures. Looking at plaintiff's Exhibit 2 (taken at a distance of 100 feet from the pole) a wire is visible which is attached near the top of the pole and extends therefrom to a guy pole almost as high, on the easterly side of the highway. If this pole is 25 feet high, then the guy pole must be 15 to 20 feet high. That part of the wire in front of the sky is visible; that part in front of the mountainside is not. Clearly much more of the wire would be invisible if the easterly end of it were attached to the pole at a point 4 feet from the ground as the cable was attached to the truck.

Looking at plaintiff's Exhibit 3 (taken 160 feet from the pole) one can see less of the wire against the sky than in Exhibit 2, and, if the wire were attached to the guy pole at a point 4 feet from the ground, there would be very little of it remaining against the sky background.

At the location of the warning sign, 40 feet still further north, there would be very little, if any, of the cable visible against the sky.

Plaintiff himself had made an unusual use of the space above the highway; he had erected an obstruc-

tion which was not naturally to be anticipated by the driver of a truck and one which was not in the direct pathway of the truck in the ordinary use of the highway. Had plaintiff taken some steps or made some effort to warn travelers of the existence of the cable, the question would have been one for the jury. In the absence of such warning, the matter was one of law for the court.

In directing the verdict for defendants, the trial judge explained that The Vehicle Code permits the operation of motor vehicles on all highways of the State with a height of 150 inches, that is, 12½ feet, and that the Pennsylvania Power & Light Company had no right to obstruct the highway with a cable without giving a proper warning of its presence, and that there was no evidence of negligence on the part of the driver, there being no duty on him to look out for the cable stretched across the highway in the absence of any warning of any kind. He declared that the "Men Working" sign warned of the presence of men working on the highway and not of the cable or the presence of plaintiff 25 feet above the highway and outside of it, on top of the pole. The operator saw Francis Quinn on the highway near the pole, and defendant moved his car slightly to the left in order to avoid him. The "Men Working" sign produced in this case the result which it was intended to produce; it caused the operator of the truck to take care in passing a workman on the highway. Such signs are intended to warn operators of vehicles that men are working on the highway and being so engaged they are not apt to watch traffic carefully, and therefore, motorists are warned to be on their guard. We agree with the trial judge that the sign had no reference whatever to the cable stretched across the road. We have combed the books carefully and we have found no case indicat-

ing that "Men Working" means "Overhead Obstruction Ahead".

Plaintiff's counsel insist that the trial judge in his explanation also erred in giving the wrong interpretation to section 902 of The Vehicle Code (Act of May 1, 1929, P. L. 905, art. IX, 75 PS §452).

That section limits the height of trucks to 12½ feet, but provides that:

". . . nothing herein contained shall be construed to require the public authorities to provide sufficient vertical clearance to permit the operation of such vehicles . . ."

The trial judge took the position that the light company had no right to obstruct the highway by the erection of a cable which at any point was less than 12½ feet high, even for a temporary purpose, without providing some means of warning, as by means of a flagman or by attaching pieces of cloth to the cable, and that the operator of the truck had a right to believe that to the extent of 12½ feet the space above the highway would be free from obstruction. In this he was right.

As the court said in McKim v. Philadelphia, 217 Pa. 243, 249 (1907):

". . . the highways are primarily for the passage of persons on foot and in vehicles. It is the duty of the municipal authorities having control of the highways to keep that fact in view, and while permitting them to be used for other purposes, it should not be done in a manner which would prevent their use by the public or would render them unsafe and dangerous. Seventy years ago the legislature of this state declared that the public highways should be constantly kept in repair and kept clear of all impediments to easy and convenient passing and traveling. This is the law of the commonwealth today, and includes the cities as well as the rural districts. The electric company was au-

thorized by the ordinance to locate and operate its railway on Eleventh Street, but there is nothing in the ordinance from which even an inference can be drawn that the use of Eleventh Street by the company should exclude the public from it or that the company was authorized to construct or operate its railway in a manner which would render the street unnecessarily dangerous."

And (p. 248) :

"The grant of power (to work on a highway) is in all cases to be exercised in such manner as to least interfere with public rights and interests, and by construction the grant or license is construed in favor of the public."

Several acts govern the construction of electric lines along highways.

The Act of April 29, 1874, P. L. 73, sec. 33, covers telegraph companies; the Act of May 8, 1889, P. L. 136, sec. 2, 15 PS §1181, gives authority to electric light, heat and power companies to enter public streets; and the Act of July 22, 1919, P. L. 1123, sec. 2, 15 PS §2332, governs telephone companies.

The Act of April 29, 1874, provides specifically that telegraph lines "shall not be so constructed as to incommode the public use of said road, streets or highways."

And while the Act of May 8, 1889, does not contain any restriction on the maintenance of buildings and apparatus in any public street, Chief Justice Maxey declared in Nelson v. Duquesne Light Co. et al., 338 Pa. 37, 43:

"It is legally implied that a municipality cannot consent to an entry by an electric company any more than to a telephone company, in the public highways which places them (poles) in an unsafe condition and which amounts to negligence."

The Act of 1919 declares that no wires, equipment or other fixtures shall be erected over any public streets "so as to injuriously interrupt the public use of said roads, streets, lanes or highways. . . ."

The State Highway Law of June 1, 1945, P. L. 1242, art. IV, sec. 411, 36 PS §670-411, provides:

". . . nor shall any telephone, telegraph, or electric light or power poles, or *other structures*, be erected upon, over, or in any portion of a State highway . . . except under such conditions, restrictions, and regulations, and subject to the payment of such fees for permits for the placing of such *structures* and openings, as may be prescribed and required by the department."

While most decisions generally turn upon the special or peculiar phraseology of the statute involved, the courts, having in mind the purpose of keeping the space above highways clear, have held that poles and wires in a street constitute a *structure*. See Village of St. Louis Park v. Casey, 218 Minn. 394, 16 N. W. (2d) 459, and Forbes v. Willamette Falls Electric Co., 19 Ore. 61, 23 Pac. 670.

That it is the policy of the State to keep clear the space above highways is further evident from section 425 of the Act of June 1, 1945, supra, 36 PS §670-425, which declares:

"It shall be unlawful to place any sign, banner, or advertising matter of any kind whatsoever on or across any State highway or on or across any structure within the legal limits of any State highway without first having obtained the written consent of the department. . . . Any such sign, banner, or advertising matter placed without the consent of the department is hereby declared to be a public nuisance. . . ."

By section 420 of the same act (1945, P. L. 1242, art. IV, 36 PS §670-420), the Secretary of Highways

is authorized to make rules and regulations for the use of all State highways.

Every existing bridge over a highway has painted upon it, in clear, large letters and figures, the legend "Clearance ... feet ... inches". All new bridges must, as a rule, have a clearance of at least 14 feet, and all power lines must be erected at least 22 feet above all public streets according to the National Electric Safety Code issued by the United States Bureau of Standards, which all utilities and the Public Utility Commission have approved.

Certainly all these precautions are taken in order to insure the safety of the operators and occupants of vehicles and they cannot be ignored by the light company which erected the cable nor plaintiff under whose direction it was erected.

While public authorities are not required to make it possible for a truck of 12½ feet to pass along any of its highways, nevertheless the operator of such a truck is entitled to assume that such space is available to him in the absence of any warning or any indication to the contrary.

The law applicable to this case has been variously stated. In 40 C. J. S. 317, §268, it is stated as follows:

"In the absence of notice to the contrary, a traveler on a highway open to the public ordinarily has a right to rely on the assumption that the highway is in a reasonably safe condition for travel and free from obstructions, and he need not keep his eyes constantly fixed on the road or path of the highway, or look far ahead for defects which should not exist; nor is he required to exercise such extreme vigilance as in all events to see defects or obstructions in the road ahead, such as a chain stretched across the road. The right to assume that the highway is reasonably safe, however, is subject to the qualification that the traveler must use ordinary care."

In 25 Am. Jur. §749, the language used is:

"It is a well-established general rule that persons using a public way which is in constant use, and when their attention has not been called to any obstructions or perils thereon, have a right to assume, and to act on the assumption, that the way is reasonably safe for ordinary travel, and this is equally true whether they are traveling at night or in the daytime. . . . While a traveler may not close his eyes and go forward in reckless disregard of what may happen, and must exercise such care and caution as may be expected of an ordinarily prudent person under the same circumstances, all that is required of him is ordinary care, and that he proceed in the usual manner, observing his general course, and keeping a general lookout. He is not bound to anticipate danger, or the presence of unlawful obstructions . . . nor must he be constantly on the lookout for unknown or latent obstructions or defects, when there is nothing to put him on his guard."

Joyce in his work on Electric Law, vol. 2, p. 984, sec. 608, declares:

"It is the duty of electrical companies whose wires are suspended along or across the streets and highways, to string them in such a manner as not to interfere with or obstruct public travel . . . and a person who is traveling in a vehicle along a public street *need not*, to relieve himself from the charge of contributory negligence, *be continually on the lookout to see* if any wires are not suspended at a sufficient height to enable his vehicle to pass thereunder in safety, assuming of course that the vehicle in which he is riding is such a one as may be ordinarily used in safety so far as any collision with wires may be concerned." (Italics supplied.)

And in section 609:

"Where a traveler is injured by collision with a guy-wire negligently placed or maintained by the company,

the latter will be liable where the traveler was in the exercise of due care. And if there is nothing in the evidence to charge a traveler with knowledge of the dangerous character of a guy wire from which he receives a shock, it is held that the court may properly refuse to submit the question of contributory negligence to the jury." (Citing, inter alia, Turton v. Powelton Electric Co., 185 Pa. 406.)

Blashfield in his Cyclopedia of Automobile Law, vol. 1, p. 586, sec. 691, states clearly and unequivocally that:

"The driver of a motor vehicle is not required to be on the lookout for wires being strung across the street lower than the top of his vehicle, without any adequate warning of their presence."

In support of this proposition he cites the case of Jacks v. Reeves, 78 Ark. 426, cited with approval by our Supreme Court in Mayhugh v. Somerset Tel. Co., 265 Pa. 498, and Bush v. Goodno, 251 N. Y. S. 271, affirmed in 182 N. E. 171 (N. Y.), on which the trial judge relied in directing the verdict for the defendants.

However, many other cases support this rule.

In Lundeen v. Livingston Electric Light Co., 17 Mont. 32, 41 Pac. 995, the court said (p. 40) :

"We think it was the duty of the defendant to have placed this guy wire so high above the ground that persons could pass under it, either on foot or horseback, in the day or night time, without danger of being injured. Placed as it was, it was not only an obstruction to the free and ordinary use of the street, but it was dangerous to the safety of persons who had the right to travel the streets. We think that a reasonably prudent person must have foreseen, when stringing this wire in the street as it was strung, that just such accidents and calamities were liable to occur as happened to the plaintiff in this case. Persons and corporations acquiring franchises and privileges to use the streets

of towns and cities in this state, for profit, should be held to a strict observance of legal obligations to guard and protect the persons, lives and property of the inhabitants thereof."

While a construction company may use a wire rope or cable as a barricade to stop vehicles being wrongfully driven over a road, "this kind of barricade *imposed a duty to provide other signals or warnings to make known the presence of such obstruction* to those entitled to such warning: Carter v. Franklin, 234 Ala. 116, 173 So. 861.

In Wunderlich et al. v. Franklin, 100 F.(2d) 164, to do this very thing, the contractor had interwoven bushes and branches between the strands of the rope or cable which was used for a barricade. Every day passing along the street one can observe pieces of white cloth attached by property owners to wires extending along the front lawn or tree lawn to warn persons of its presence. The trial judge properly held that with a low hanging cable against a dark background it was the duty of the light company and plaintiff, who directed its installation, to either attach something to the cable to indicate its presence or to locate a flagman who would point out its presence to oncoming travelers.

The traveling public has the right to assume that there is no dangerous impediment or obstruction of a temporary nature in any part of the highway unless proper warning is given of its existence by the person responsible for its presence there: Doherty v. Romano, 135 Atl. 62 (N. J.).

Our research reveals no Pennsylvania case in which the exact questions involved were considered.

In Campbell v. Western Union Tel. Co., 139 Pa. Superior Ct. 553, affirmed in 341 Pa. 103, a low hanging wire stretched across the street swept a portable cab, in which plaintiff was sitting, from a truck onto the highway, injuring him. As originally installed, the

wire was high enough but a sleet storm a few days before the accident caused it to sag. The court held that the question was properly left to the jury to decide whether the failure of the company to inspect and repair the wire established its negligence. There was no discussion, however, on the duty of the appellee or the driver of the truck.

In Geiger et al. v. Dowdy et al., 111 Pa. Superior Ct. 485, at about 10 a.m. one morning after a snow plaintiffs were driving in a car along a highway on which Bell Telephone Company employes were taking down a tree. They saw a man coming back from a parked truck holding a red piece of material in his hand. They saw the rope when 35 feet from the truck. It was high enough to pass under on the left side but not on the right. They could not go to the left because the man was standing in the way. The plaintiffs alleged as the basis of their claim the stretching of the rope across the highway, failure to give sufficient and timely warning, and the sudden rushing of one of the employes in front of the car causing the driver to swerve from his course and collide with the truck. The court said (p. 489) :

"Highways are primarily for public travel and as a consequence must be kept in condition reasonably safe for use by vehicles, including automobiles. Any person who leaves a dangerous obstruction in a public highway may be held liable for an injury caused thereby. At times it is necessary and proper for municipalities, public service companies, and private individuals to obstruct the public roads and streets, but then it is the *duty* of the one making repairs or engaged in such extraordinary use of the highways *to give warning of the dangerous condition created*." (Italics supplied.)

And such warning must be given in time so that the obstructing rope might be seen in time to avoid a collision with it. Judge Parker then declared:

"As was said by then Mr. Justice Frazer in Clamper v. Phila., 279 Pa. 385, 124 A. 132: We cannot say, however, as matter of law, that a rope stretched at such distance (four to six feet) above the highway as to be out of the range of the direct rays of the headlights of automobiles was such barrier as a traveler in the exercise of ordinary care was bound to notice.' . . . Under the facts as the jury found them, the driver was prevented from driving on his own side of the road by the rope, and an employee of the defendant company placed himself in such a position that passage could not be made to the left. The jury might properly have found that reasonable care required the appellant's employees to hold the rope in a different position, to have given more timely warning and not at a late time signal to make a sudden stop. We are of the opinion that the facts presented a question for the jury which has found for the plaintiffs."

The driver of a car is not required to notice every other car that happens to be approaching within the range of his vision; it is only his *duty to observe those which are within the area ordinarily covered in the act of looking:* Newman v. Reinish, 106 Pa. Superior Ct. 351, 354.

In Long et ux. v. Pa. Truck Lines, Inc., 335 Pa. 236, 239, the court said:

"Appellant was not under a duty to anticipate that the driver of a vehicle coming in the opposite direction around the curve would occupy the center of the highway in violation of the law of the road. . . . The traveler on a highway can take for granted, at least to a certain degree, that others approaching him will observe the customary rules of the road and so long as he keeps to his side of the road *need not keep his eyes at all times riveted on the highway in front of him.*"

In Mayhugh, to use, v. Somerset Telephone Co., 265 Pa. 498, plaintiff walked along the street and ran into

a hanging wire which had touched an electric light wire and become charged. The court said (p. 502) :

"His right as a pedestrian was to cross the street at any point, even if in so doing he might encounter risks that were not on the sidewalk; but unless they were manifest, it was for the jury, and not the court, to say that he was negligent: Miller v. Lewistown Electric Light, Heat and Power Company, 212 Pa. 593. And he was not bound to anticipate that the defendant would negligently permit one of its wires to become dangerously charged with an electric current and hang over the street. . . . It remains only to determine whether the plaintiff should have seen and avoided the wire. Two of his witnesses testified that they had seen it shortly before, and in view of this it is earnestly insisted the trial judge should have held that the plaintiff should have seen it and avoided it. If the witnesses saw it, it was their duty to pass around it; but what the plaintiff did not see, and what, from the testimony, it can be fairly inferred he was not bound to see, he was not bound to avoid. . . . A fair inference to be drawn from the foregoing is that, even if it was the duty of the appellee to look up as he passed along the street, he might not have seen the wire, in view of the condition of the weather; *but he was not required to look up. He was under no duty to anticipate unusual danger* from an electric wire sagging in front of him five or six feet above the surface of the street. It is not expected or required of a traveler over a highway to look up to see if perchance a stray wire may be dangling ahead of and above him: Jacks v. Reeves, 78 Ark. 426. If the appellee had been injured by a defect in the street itself, or had encountered danger there which he must have seen if he had been looking where he was going, a well settled different rule would of course apply."

The trial judge relied principally on the case of Bush v. Goodno, 251 N. Y. S. 271, 259 N. Y. 538, affirmed in (App. Div.) 182 N. E. 171. Plaintiff recovered a verdict of $7,500 for injuries sustained. The telephone company was installing on poles a line of wire running easterly and westerly above and across Colvin Avenue which runs north and south in the Village of Kenmore, Erie County. The wire was extended across that avenue about 8 to 10 feet above the pavement. Company workmen were located on the ground westerly of Colvin Avenue behind some houses, and plaintiff, another employe, was on the third telephone pole easterly of the avenue, some 300 feet away. The wire was attached to him. On account of their distances from Colvin Avenue, and because of intervening buildings, these men could not ordinarily have been observed by a person driving a motor car with due caution northerly on Colvin Avenue. No workman was on any pole near the avenue. There was nothing except the wire to give any indication of what work was going on. The wire was $\frac{5}{16}$ of an inch in diameter, galvanized and uninsulated. The day was bright and the sky clear. Defendant was driving a truck northerly, the top of which was about one foot higher than that of an ordinary passenger car. He testified that as he approached he saw no wire, but did see two men near the easterly curb. They testified that one of them, the foreman, stepped into the street when defendant was over a block away from the wire and repeatedly waved his arms and shouted at defendant, although he did not point to the wire. Defendant drove on, the wire caught under the edge of the top of his truck and was pulled so hard that it dragged plaintiff off the pole and injured him severely. Judge Taylor of the appellate division said (p. 272) :

"The first question which confronts us is this: Was there sufficient proof of negligence in defendant?

Whether such a mishap was reasonably to be apprehended had defendant known of the presence of the wire is a matter of doubt. Palsgraf v. Long Island R. Co., 248 N. Y. 339, 162 N. E. 99, 59 A. L. R. 1253. However, a determination of that question factually in plaintiff's favor would still leave plaintiff under a burden of proof, viz., the obligation to show that defendant saw or was bound to have seen the wire—at any rate, to have stopped his truck in time to have avoided injuring plaintiff. Defendant was driving along on smooth pavement. This wire was not easily visible, considering its size and character and the condition of the sky, *and nothing was attached to it to warn vehicle drivers of its presence*. Defendant says that he did not see the wire, and it seems improbable that had he seen it he would have deliberately run against it. Other automobiles had passed along without hitting it. Assuming that defendant suddenly saw the two men, and that they shouted and gesticulated as they say they did, this would distract defendant's attention from the wire above and in front of him, rather than call his attention to it. Was an ordinarily prudent person bound, nevertheless, to see this wire? Was he bound to understand who the men in front of him were, whom they represented, and what their actions meant, there being no construction truck or anything else which defendant could see in front of him on or near the street, indicating any reason for his stopping? The men on the street were not dressed to make it manifest that they were telephone company employees; they were dressed in ordinary citizens' clothes. Was it not reasonable that defendant, as he claims, drove right on because he thought that the men were 'hitch hikers'?

"There is good authority to the effect that a vehicle driver is not required to be on the lookout for wires extending across a street lower than the top of his

vehicle. Western Union Telegraph Co. v. Eyser, 2 Colo. 141; Jacks v. Reeves, 78 Ark. 426, 95 S. W. 781, 783. The right of the telephone company to stretch its wires was always subject to the public user of the street. Sheldon v. Western Union Telegraph Co., 51 Hun 591, 4 N. Y. S. 526, affirmed 121 N. Y. 697, 24 N. E. 1099. The following ordinance, introduced in evidence, was in effect in the village of Kenmore: 'No telephone, telegraph or electric light wire, either main cable or individual service wire, shall be strung or placed along or across any street of the village, which shall be less than twenty feet above the surface of the ground. Any person violating this ordinance shall be subject and liable to a fine of ten dollars for each and every violation thereof.'

"A violation of this ordinance was evidence of an act of negligence in the telephone company. Schumer v. Caplin, 241 N. Y. 346, 351, 150 N. E. 139; Weaver v. Dawson County Mutual Tel. Co., 82 Neb. 696, 118 N. W. 650, 22 L. R. A. (N. S.) 1189. Either this mishap was due to the negligence of the telephone company employees in placing this wire where it was without adequately warning street users of its presence, or else the occurrence was a pure accident. Paul v. Consolidated Fire Works Co. of America, 212 N. Y. 117, 120, 105 N. E. 795.

"Plaintiff was bound to prove that this unfortunate mishap was proximately due to the failure of defendant to use ordinary care in observing and avoiding this wire. He has failed to do so. On this record the jury should not have been permitted to say that defendant, in the use of reasonable caution, should not only have seen this wire but should have apprehended that to drive on under it was likely to cause serious injury to person or property. The verdict was contrary to the evidence, and the judgment and order ap-

pealed from should be reversed on the law and the complaint dismissed."

The court of appeals, including in its membership at the time Chief Judge Pound and Judges Crane and Lehman, all distinguished jurists, affirmed the appellate division in a memorandum opinion in the following language (259 N. Y. 538):

"The complaint alleged that the plaintiff was working in the vicinity of Colvin boulevard in the village of Kenmore, Erie County, on a telephone pole from which was suspended a wire crossing Colvin boulevard; that defendant operated his automobile along Colvin boulevard at an improper rate of speed and in an improper manner *without observing the wire*, and failing to observe or heed warnings or signals given to him, and that the automobile struck the wire, with the result that the plaintiff was thrown from the pole and sustained the injuries complained of. The Appellate Division held that plaintiff had failed to prove that the accident was due to failure on the part of defendant to use ordinary care; that on the record the jury should not have been permitted to say that defendant, in the use of reasonable caution should not only have seen the wire but should have apprehended that to drive under it was likely to cause serious injury to person or property. Judgment affirmed."

Other courts have taken the same position. The Court of Errors and Appeals of New Jersey declared in Matheke v. United States Express Co., 86 N. J. L. 586, 588, 589, 92 Atl. 399:

"There is . . . a . . . fundamental error that runs through the case and is presented by the refusal of the district court to charge the defendant's second request, viz., that the driver of the wagon had the right to presume that the street was free from a scaffold suspended from the elevated structure. This request embodied a

proper statement of the law, and ought to have been charged as correctly presenting the legal aspect of the case if the driver of the wagon did not see the scaffold or know of its existence, which the jury must have found to be the fact if they accepted the statement of the driver, who testified that he did not see the scaffold because he was looking at his horses, and that he did not look up because he was looking where he was going. If, notwithstanding the driver's denial that he saw the scaffold, the jury had found that he did see it, a logical and *perhaps* a legal basis of negligence would have been laid; but that question was not submitted to the jury; what was left to the jury was the failure of the driver to look for the scaffold, which admitted fact was treated both in the trial court and in the Supreme Court as being a negligent act. This assumes that it was the duty of the driver to look out, *or rather to look up*, for such an obstruction to travel as this suspended scaffold proved to be. The *law*, however, *imposed no such duty upon the driver*, who, as correctly stated in the request, has the right to presume that the street was free from a temporary *obstruction in so unusual a place*. Of course, if the driver saw the obstruction or had knowledge of its existence, it was his duty to use reasonable care to avoid it, but if he did not see it or know of it, he was under no duty to look for something that he had the right to presume did not exist. The correct rule is that stated by this court in Durant v. Palmer, 29 N. J. L. 544, where, speaking of the public highway, it was said:

" 'The traveling public have a right to suppose that there is no dangerous impediment or pitfall in any part of it without a light placed to give warning of it or a suitable railing to protect from it.'

"This was said of an open area in the surface of the highway, but the rule thus laid down applies to all

interferences with the safety of travel on a highway arising from those temporary uses of it that are unusual in the sense that they are not the normal and permanent incidents of a highway. Permanent encroachments upon the highway, such as front door steps, hitching posts, awning poles, and this elevated railroad structure itself, are incidents of the highway of which the traveling public must take notice; but *merely* temporary obstructions to travel, such as an open area or coal chute, the piling up of building materials, *a lowered arc light* or a sign or awning suspended so low as to impede travel, are matters as to which, in the absence of *knowledge or of actual warning,* the presumption is that no such obstructions to travel will be encountered. Such a presumption is essential to the protection of the public, especially in congested centers of traffic and travel where rapidly moving cars and motors are to be encountered and, if possible, avoided, to say nothing of the safeguarding of slower-moving vehicles and pedestrians. These normal incidents of surface travel suffice to tax the skill of a driver whose whole attention can be given to what is *within his field of vision* without adding to his duties that of making continuous investigations as to what is taking place *over his head or what has taken place above the ordinary parallel of vision,* since to a mathematical certainty his ability to give attention to what is before him will be diminished in exact ratio to the attention he gives to the making of such *aerial observations.* The basis of this salutary rule is the presumption that obtains in the cases to which it applies, which was correctly stated in the defendant's request and ought to have been charged." (Italics supplied.)

In Nessen v. City of New Orleans, 134 La. 455, 64 So. 286, the city extended a wire rope to keep back crowds of persons while the carnival processions were

passing along Canal Street, four days before the parade. It used galvanized wire of neutral tint, hard to see by day and impossible by night. The rope was $\frac{5}{16}$ of an inch in diameter and was placed 41 inches above the sidewalk. Decedent started to run to reach a trolley car and struck the wire throwing him to the ground. A verdict for plaintiff was affirmed. The court said (p. 460):

"It is hardly necessary to cite authorities to show that the stretching of wires or ropes along or across public thoroughfares low enough to strike passing pedestrians or vehicles constitutes an unauthorized and dangerous obstruction to public travel."

Then it quotes with approval (p. 461):

"The negligence of the officials was not in allowing the rope to be placed there, but in permitting it to remain without proper warning to or protection of the traveling public. . . . The city has the right temporarily to allow obstructions on the streets and sidewalks for any lawful purpose; *but while they remain there the traveling public should have notice and warning thereof.*'" (Italics supplied.)

The case of Wheeler v. Fort Dodge, 131 Iowa 566, 108 N. W. 1057, contains a valuable citation of authorities on the subject matter of obstructions in public streets and the liability of municipalities for permitting their existence. There the town permitted a wire to be stretched across a highway for an aerial performance. It was contended that this was not a nuisance. The court said (p. 570):

"With this contention we cannot agree. The fact that the wire in most of its course passed through the air above the heads of the people using the walks and carriage way below does not remove its character as an obstruction of the street. The public right goes to the full width of the street and extends indefinitely upward and downward, so far at least as to prohibit

encroachment upon said limits by any person by any means by which the enjoyment of said public right is or may be in any manner hindered or obstructed or made inconvenient or dangerous. The principle here stated has been upheld in a multitude of cases."

In a later Iowa case, Hatfield v. White Line Motor Freight Co., 223 Iowa 7, 272 N. W. 99, a derrick was mounted on the roof of an office building. It consisted of a pole on a framework with three ropes from the top running in different directions to hold and steady the pole. Two of these ropes were fastened at the back of the building and the third was stretched across the street and fastened either to a fence or to a bumper at times, and sometimes it did not stretch across the street but was fastened down in front of the building near a mixer. The pole was 12 feet high. There was a winch with cable used in connection with the derrick to hoist stones.

The street was open to travel, at least trucks were passing through quite frequently to a factory building. The rope that was stretched across the street was called a tag line and its use was to keep the derrick from falling backward. The other two ropes kept it from falling forward.

When drawing up stone the pole will give at least a little, and that would cause the tag line to slacken or sag.

On the afternoon of September 3, 1935, they were pulling up a stone. Decedent was sitting on one of the ropes to keep it tight when the tag line was struck by the truck of defendant, suddenly jerking the line on which decedent was sitting and threw him into an elevator shaft where he met his death.

Negligence charged was, as in our case: First, failing to keep a lookout for the rope; second, attempting to drive under the rope; third, failing to avoid contact with the rope; fourth, driving against the rope;

fifth, failing to stop before striking the rope; and, sixth, continuing to drive ahead after striking the rope, pulling it down.

By amendment, a seventh ground was added: That it was negligent in failing to stop the truck within the assured distance ahead. This last the court disregarded entirely, saying, it saw no applicability of that rule which is "in reference to speed".

At the close of plaintiff's case, motion for directed verdict was sustained and the judgment on the verdict was affirmed. The court said (p. 13):

"It must also be evident, when one stops to think, that the driver of the vehicle in the highway, constructed as trucks and automobiles are constructed, is not chargeable in the same degree with discovering aerial objects as in discovering objects in the street. That whatever may have been the rights of the contractor erecting the building, or even the owner of the building, to obstruct, litter up, the street in front of his premises, this right did not to the same extent obtain as to aerial objects.

"The record also is entirely void of any testimony, or any showing as to anything that was done to call the attention of the driver on the street *to be constantly looking up instead of looking where he was going on the street, to discover dangerous instrumentalities up in the air,* which would be out of his line of vision as he picked his way through the street, crowded as this street was with so many obstacles to easy travel.

"With these considerations in mind, therefore, we are of the opinion, taking all of the circumstances that existed at the time of the accident into account, that *there is no showing here whatever of any negligence on the part of the driver of the truck,* and upon this ground alone the motion to direct a verdict should have been sustained." (Italics supplied.)

As did our Supreme Court and the New York Court of Appeals, it referred to Jacks v. Reeves, 78 Ark. 426, in which it was held that a traveler driving along the highway is not required to look up to see if a telephone wire is in reach of the top of his vehicle in order to be free from contributory negligence precluding a recovery for injuries received in consequence of the vehicle coming in contact with a wire dragging over the highway in consequence of a broken pole. It then said:

"If in such a case the traveler is not required to look up, to see if the wire is in reach of the top of his vehicle, in order to be free from contributory negligence, *it certainly could not be held that there was any duty on him to be looking up*." (Italics supplied.)

Our case is quite different from Shearer v. Puent, 166 Minn. 425, 208 N. W. 182, cited by plaintiff. There plaintiff was trying to extricate an automobile which had run off the road in the night and at a time when there was little traffic. He fastened the wrecking car to a telephone pole on the opposite side of the highway and stretched a chain across the road to the car, and by the use of a windlass sought to bring it to the road. Defendant drove his car into the chain causing the wrecking car to tip, hurting plaintiff. The court said that the question of negligence of the driver running into the chain was for the jury. There the chain was within the range of the lights; here the cable was up in the air.

We are satisfied from a careful consideration of the whole case that the trial judge properly directed a verdict for defendants, and accordingly, we enter the following

*Order*

Now, July 26, 1949, the motion of Richard Brown, plaintiff, for a new trial is denied.